Aegis Property Services Corp., Appellant, v Hotel Empire Corp. et al., Respondents.

Hotel Empire Corporation, Third-Party Plaintiff-Respondent, and Imero Fiorentino Associates, Inc., Third-Party Plaintiff-Appellant, v Lansco Corporation, Third-Party Defendant-Respondent.

First Department, January 24, 1985

### APPEARANCES OF COUNSEL

*Jacob H. Zamansky* of counsel (*Allen Green* with him on the brief; *Bell, Kalnick, Beckman, Klee & Green,* attorneys), for plaintiff-appellant.

*Susan L. Fox* of counsel (*Smith, Steibel, Alexander & Saskor, P. C.,* attorneys), for Imero Fiorentino Associates, Inc., respondent and third-party plaintiff-appellant.

*Leonard H. Rubin* of counsel (*Choate, Moore, Hahn & McGarry,* attorneys), for Hotel Empire Corp., respondent and third-party plaintiff-respondent.

*Lionel A. Barasch* of counsel (*Clarence S. Barasch,* attorney), for The Lansco Corporation, third-party defendant-respondent.

### OPINION OF THE COURT

SANDLER, J. P.

This is an action by Aegis Property Services Corp. (Aegis), a real estate broker, asserting its right to a commission in connection with a lease entered into on December 5, 1980 between Hotel Empire Corp. (Empire) as landlord and Imero Fiorentino Associates, Inc. (Imero), as tenant.

As developed in the papers submitted on the motion at Special Term, Aegis claims that it was the procuring cause of that lease

notwithstanding the fact that the lease recited that another broker, Lansco Corporation (Lansco), was the sole broker entitled to a commission, and the undisputed facts establish that the extended negotiations culminating in the lease had been conducted exclusively by Lansco. Alternatively, Aegis contends that it was deprived of its commission as a result of Empire's bad faith in entering into the negotiations in which Lansco acted as broker. Finally, Aegis argues that it was deprived of a commission as a result of a wrongful conspiracy entered into by Empire, Imero and Lansco.

■ ■ Aegis appeals from an order entered in the Supreme Court, New York County, on January 24, 1984, and from the judgment entered thereon on May 2, 1984, which granted Lansco's motion for summary judgment dismissing the complaint and the third-party complaints. We agree with Special Term that the undisputed facts fail to disclose a basis for recovery by Aegis on any of the theories alleged.

■ In particular, the record discloses no factual basis for Aegis' claim that it was the procuring cause of the lease that was in fact negotiated by Lansco. Nor does it reveal any factual basis for the contention that Empire's participation in negotiations in which Lansco acted as broker represented a bad-faith attempt to deprive Aegis of its commission. Indeed, the underlying claim urged here appears to be based, not on the bad faith of the party responsible for paying the commission, in this case Empire, the lessor, but rather on allegations of bad faith addressed to the lessee, Imero. Although not set forth in the complaint, the essential theory for recovery advanced in Aegis' motion papers is that Imero tortiously interfered with its relationship with Empire by wrongfully terminating its employment prior to undertaking negotiations with Empire.

From the circumstance that Imero authorized Lansco to submit a proposal for the Empire space within one month after terminating its relationship with Aegis, Aegis urges the court to accept as giving rise to a factual issue the speculative inferences that (1) Imero had decided to make such a proposal before terminating its relationship with Aegis, (2) had withheld that determination from Aegis because it wanted Lansco to negotiate the matter, and (3) had replaced Aegis with Lansco in order to permit Lansco, and not Aegis, to receive a commission in connection with the lease that was ultimately negotiated.

■ When this contention is evaluated in the context of the undisputed facts and the obvious realities of the events, we think it clear that the speculative inferences relied upon are far

too tenuous and insubstantial to give rise to the factual issue asserted. Moreover, even if it were accepted that more than " '[a] shadowy semblance of an issue' " was presented (*Di Sabato v Soffes,* 9 AD2d 297, 300) we are not persuaded that it would, without more than can reasonably be inferred from this record, sustain an action for recovery under the circumstances presented.

The space with which we are concerned was deteriorated space on the mezzanine floor of the Hotel Empire, which for at least one year and eight months prior to the lease entered into on December 5, 1980, Empire had been trying, without success, to lease. The availability of the space was not confidential information known only to Aegis. A large sign at the Hotel Empire announced Empire's interest in leasing the space and it had been the subject of repeated newspaper advertisements, which is indeed how its availability had come to the attention of Aegis in April of 1979. It is a fair assumption that its availability was known to every active real estate broker concerned with commercial property on the west side of Manhattan, and that it had been exhibited, obviously without success, by more than one broker to a number of other potential lessees.

Negotiations culminating in the lease entered into on December 5, 1980 were initiated by a written proposal dated August 8, 1980, submitted on behalf of Imero by Lansco, which had been recently retained by Imero. The proposal led to a period of negotiations extending over several months that were marked by other proposals and counterproposals in the course of which Lansco performed the negotiating function normally incident to a broker's role.

The Aegis claim that it is entitled to a brokerage commission in connection with the December 5, 1980 lease, and not the broker who conducted the negotiations that led to the lease, is based on the following circumstances. In early April, 1979, Aegis was told by Imero of its interest in securing new space. At about the same time, Aegis learned about the availability of the Empire space from a newspaper advertisement. Apparently for reasons unrelated to Imero, Martin Stern, an Aegis employee, secured permission to show the space, confirmed the availability of 14,000 square feet, ascertained the rent sought by Empire, and secured a floor plan. The space was shown to Imero executives on July 5, 1979.

As the record makes indisputably clear, and contrary to the deceptive, conclusory statement by Stern referred to in the dissenting opinion, Imero expressed no interest in the space and

did not authorize Aegis to make a proposal in connection with it. In fact no proposal for the space was ever made by Aegis on behalf of Imero, and none was ever authorized. From time to time, thereafter, Stern encouraged Imero to reconsider the space, and it is clear that these suggestions were not responded to affirmatively. It further appears that for some months little activity occurred in connection with the effort to find space, that effort having, during that period, a low priority in Imero's plans.

In March, 1980, the need for new space apparently being seen as more urgent, Imero retained Robert Bell, a partner in their accounting firm, as a consultant to assist in the search, agreeing to compensate him for the time he spent. Bell was instructed to work with Aegis, which he did, and in the course of several months extending from April to early July, 1980, Bell was shown some 12 to 20 possible spaces. In addition, Bell requested Lansco, a real estate brokerage firm whose principals he knew from a prior transaction, to be alert for any possible suitable space.

From time to time, Stern urged Bell to persuade Imero to consider again the Hotel Empire space. Bell deposed that he inquired of Imero's executives about it and was informed that they were not interested because of its poor physical condition.

In early July, 1980, Bell terminated the relationship with Aegis for reasons that are in part disputed. Lansco was then retained by Imero, and in response to a request submitted a comprehensive list of available spaces, which included the Hotel Empire space. Imero then authorized Bell to examine the space, which was followed by a second inspection by Imero executives. Thereafter, Lansco was authorized to make the August 8, 1980 written proposal.

Addressing first the Aegis claims that it was the procuring cause of the December 5, 1980 lease and that alternatively it had been deprived of a commission by Empire's bad faith in entering into negotiations with Lansco as broker, it is surely appropriate to start with what remains the classic exposition of the governing rules of law in this area set forth by the Court of Appeals in *Sibbald v Bethlehem Iron Co.* (83 NY 378). (See, e.g., *Greene v Hellman,* 51 NY2d 197.) The analysis in *Sibbald* of the issues that recurrently arise in actions by brokers for commissions is as fresh and pertinent today as it was when the opinion was written in 1881.

The Court of Appeals said, with regard to the broker's function and his right to earn commissions, the following (at p 381):

"The duty he undertakes, the obligation he assumes as a condition of his right to demand commissions, is to bring the buyer and seller to an agreement. In that all the authorities substantially concur, although expressing the idea with many differences of phrase and illustration."

Reviewing the existing authorities and the different ways in which the rule had been formulated in varying individual circumstances, the court went on to say (at p 382): "It was not meant by these cases, and we do not mean, that the broker must of necessity be present and an active participator in the agreement of buyer and seller when that agreement is actually concluded. He may just as effectually produce and create the agreement, though absent when it is completed and taking no part in the arrangement of its final details. And it is to describe such instances that courts have used a different form of expression, entirely accurate in its proper application, but capable of being warped from its obvious meaning. In *Lloyd* v. *Matthews* (51 N.Y. 132) the phrase used was that the broker was entitled to reward when the sale was effected through his agency as the procuring cause. And in *Lyon* v. *Mitchell* (36 N.Y. 237) the broader language is used that his efforts must have led to the negotiations that resulted in the purchase * * * But in all the cases, under all and varying forms of expression, the fundamental and correct doctrine is, that the duty assumed by the broker is to bring the minds of the buyer and seller to an agreement for a sale, and the price and terms on which it is to be made, and until that is done his right to commissions does not accrue."

The Court of Appeals went on to say (at p 383): "The broker may devote his time and labor, and expend his money with ever so much of devotion to the interests of his employer, and yet if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions * * * And in such event it matters not that after his failure, and the termination of his agency, what he has done proves of use and benefit to the principal * * * He may have introduced to each other parties who otherwise would have never met; he may have created impressions which, under later and more favorable circumstances, naturally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no claim * * * As was said in *Wylie* v. *Marine National Bank* (61 N.Y. 416, *supra*), in such a case the principal violates no right of the broker by selling to the first party who offers the price asked,

and it matters not the sale is to the very party with whom the broker had been negotiating."

To these rules the Court of Appeals noted one important limitation (at pp 383-384): "If the efforts of the broker are rendered a failure by the fault of the employer; if capriciously he changes his mind after the purchaser, ready and willing, and consenting to the prescribed terms, is produced * * * then the broker does not lose his commissions. And that upon the familiar principle that no one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non-performance. But this limitation is not even an exception to the general rule affecting the broker's right, for it goes on the ground that the broker has done his duty, that he has brought buyer and seller to an agreement, but that the contract is not consummated and fails through the after-fault of the seller."

In language directly relevant to the claims here urged, the Court of Appeals observed (at pp 384-385): "[T]he right of the principal to terminate his authority is absolute and unrestricted, except only that he may not do it in bad faith, and as a mere device to escape the payment of the broker's commissions. Thus, if in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success, the seller should revoke the authority of the broker, with the view of concluding the bargain without his aid, and avoiding the payment of commissions about to be earned, it might well be said that the due performance of his obligation by the broker was purposely prevented by the principal. But if the latter acts in good faith; not seeking to escape the payment of commissions, but moved fairly by a view of his own interest; he has the absolute right before a bargain is made while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot thereafter claim compensation for a sale made by the principal, even though it be to a customer with whom the broker unsuccessfully negotiated, and even though, to some extent, the seller might justly be said to have availed himself of the fruits of the broker's labor."

■ Applying to the facts in this case these still authoritative governing principles, it is surely clear that Aegis was not the procuring cause of the December 5, 1980 lease; that Aegis at no point had procured for Empire a tenant "ready, willing and able to lease the space in question" as Aegis alleged in its complaint; had not brought "the minds of the buyer and seller to an agreement", and had not even, to use a different formulation appropriate where the parties introduced by the brokers themselves negotiate the agreement, brought " 'the parties together

in an amicable frame of mind, with an attitude toward each other and toward the transaction in hand which permits their working out the terms of their agreement.'" (*Salzano v Pellillo,* 4 AD2d 789, 790.)

It seems equally clear that ..othing in this record remotely supports the claim that Empire acted in bad faith to deprive Aegis of its commission. All that Empire is shown to have known at the time it entered into the negotiations that led to the lease was that Aegis had shown the space to a certain client in July, 1979, and that no proposal was thereafter ever made by Aegis on behalf of that client. This is manifestly insufficient to sustain the claim that Empire acted in bad faith, in an effort to deprive Aegis of a commission that it would otherwise have earned.

■ We turn finally to the issue previously described above as representing the essential claim advanced by Aegis in this case: the claim that Imero at some point determined to make a proposal for the space to Empire and withheld that intent from Aegis with a view to replacing Aegis with Lansco, and permitting Lansco, and not Aegis, to earn the commission. As already observed, the speculative inference urged upon the court by Aegis seems to us too remote and tenuous to give rise to the factual issue relied on to preclude summary judgment.

Preliminarily we observe that there is nothing inherently suspicious or doubtful in Imero's authorization to its new broker to present a proposal with regard to a property first inspected by Imero in July, 1979 and then found unsuitable. For over a year, Imero had been looking for suitable space without success. For three months, the search had been conducted on an urgent basis. It is hardly a cause for surprise or suspicion that upon review with their newly retained broker of the then available spaces, Imero decided on the basis of the circumstances then existing that the previously rejected space was worth further consideration.

It is difficult to ascertain from the papers submitted on behalf of Aegis when it is alleged that Imero had determined to make a proposal for the space but had withheld that decision from Aegis in an effort to permit the commission to be earned by Lansco. In April, 1980, Imero had directed Bell to continue to work with Aegis, a direction that would seem incompatible with any then existing intent to deprive Aegis of a commission. Over several months Imero compensated Bell for his time in examining over a dozen spaces that had been called to his attention by Aegis. It is surely fanciful that this represented a charade intended to

conceal a secret purpose to divert the commission to be earned on the Empire lease from Aegis to another broker. Even more conclusive is the uncontradicted testimony that Aegis had been authorized to present a proposal on another property which it had shown Bell. Since the successful consummation of that transaction would have resulted in a commission to Aegis, it is difficult to reconcile that authorization with the conspiracy that Aegis attributes to the parties in this case. Finally, the record does not even begin to suggest why it would have made any difference whatever to Imero if the commission to be paid by Empire on the execution of the lease was paid to Lansco rather than to Aegis.

In an effort to provide some color of support for their claim of a conspiracy, Aegis purports to find something suspicious in the fact that Bell had known the principals in Lansco from a prior transaction in which that firm had acted as broker, and that he had asked Lansco to be alert to any suitable spaces. But it is hardly surprising for a consultant retained because of his familiarity with real estate transactions to know real estate brokers. Nor was there any impropriety whatever in Bell asking another broker to be alert to the availability of spaces not called to his attention by the broker with whom he was working. It is not claimed by Aegis, nor could it have reasonably done so, that it had been retained on an exclusive basis.

As to Bell's purported statement to Stern that Aegis' services were no longer required because Imero was no longer interested in new space, it is not unusual to terminate a relationship with someone found unsatisfactory with an explanation intended to avoid needless acrimony. Moreover, this alleged statement must be considered with Bell's statement that he had explicitly told a named principal in Aegis, not controverted by that principal, that he was terminating the relationship because Stern had attempted to persuade Imero executives to consider property which Bell had found unsuitable.

Further bearing upon the effort to attribute deceitful behavior to Bell, is the uncontradicted evidence that during the period Bell acted as Imero's consultant Aegis had been authorized to present a proposal on another property. Also pertinent is Bell's statement that he had urged Imero during this period, without success, to make an offer on another property that he had been shown by Aegis. Nothing in the foregoing provides factual support for the claim that Bell acted dishonorably in an effort to divert from Aegis to Lansco the commission on the Hotel Empire property, and the inextricably linked imputation that he had violated his obligation of trust to Imero.

In short, the factual issue with regard to Imero's motives on which the Aegis claim is entirely premised rests upon the most doubtful kind of speculative inferences, and indeed speculative inferences that are contradicted at every point by the common-sense realities of the relevant events.

But even if it were to be accepted that the circumstances described above give rise to some kind of factual issue with regard to Imero's motives of the kind claimed, it is at best doubtful that, without more than can be reasonably inferred from this record, a viable legal claim would have been presented. The issue sought to be raised has been more commonly addressed by the courts in the situation in which it is alleged that the broker has been terminated in bad faith by the party responsible for payment of the commission.

In that situation, the governing rule remains that described earlier which was set forth in *Sibbald v Bethlehem Iron Co.* (83 NY 378, *supra*). As the Court of Appeals there said, a principal may not terminate the broker's authority "in bad faith, and as a mere device to escape the payment of the broker's commissions" (at p 385). The illustration given was one in which the authority was terminated "in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success". (*Sibbald v Bethlehem Iron Co., supra,* at p 385.) Apart from such a bad-faith effort to avoid paying commission, "the right of the principal to terminate his authority is absolute and unrestricted". (*Sibbald v Bethlehem Iron Co., supra,* at p 384.)

The right of a party to a transaction not obligated to pay the broker's commission to terminate its relationship with a broker is surely not more circumscribed than the right to terminate of the party obligated to pay the commission. Even if we were to assume that Imero had determined to make a proposal for the Empire space before terminating Aegis, it is clear that no proposal had been made or authorized at the time of the termination and that negotiations had not then commenced.

No doubt a different question would have been presented if the record provided factual support for the conclusion that Imero had determined to lease the Empire space on the terms already stipulated by Empire, and had replaced Aegis with Lansco for the single purpose of depriving Aegis of the commission to be earned on the execution of the lease.

Such a situation, clearly not presented here, would have presented a problem somewhat similar to that addressed by the Court of Appeals in *Keviczky v Lorber* (290 NY 297) with one significant difference. In *Keviczky* the buyer, after an agreement

on all essential terms had been reached with the seller, terminated the broker's employment because of his refusal to agree to a demand to refund to the buyer the greater part of the commissions to be earned. Thereafter, the transaction was completed with a broker who agreed to that demand. Even in that situation it is not without significance that a judgment for the broker was affirmed by a closely divided court, with three dissenting Judges concluding, in an opinion by Chief Judge Lehman, that the refusal of the terminated broker to agree to the demand merely established his failure to bring about an agreement between the buyer and the seller. (Cf. *Newberry & Co. v Warnecke & Co.,* 267 App Div 418, affd 293 NY 698; *Byrne, Bowman & Forshay v 488 Madison Ave.,* 11 Misc 2d 587, affd 286 App Div 826.) In any event, the issue that would have been presented by the hypothesized situation is not before us, it being clear that Lansco was not authorized to accept the lease on the terms previously proposed by Empire, and there being nothing other than sheer speculation to support the inference that Imero acted in bad faith.

■ For the reasons already set forth, and for others that need not be detailed, it is clear that the second cause of action seeking damages on the basis of a conspiracy among the several parties was properly dismissed at Special Term. Nor, for reasons already stated, do we perceive any basis at all for permitting Aegis to replead to set forth explicitly a claim of tortious interference by Imero with Aegis' "relationship" with Empire, that claim inevitably resting upon the alleged wrongfulness of Imero's action in terminating Aegis' services and being, in any event, legally insufficient with regard to Empire, a party to the alleged contractual relationship. (See, e.g., *Bereswill v Yablon,* 6 NY2d 301; *Friedman v Roseth Corp.,* 270 App Div 988.)

For the reasons set forth above, the order of the Supreme Court, New York County (Alvin Klein, J.), entered on January 24, 1984, and the judgment entered thereon on May 2, 1984, which granted Lansco's motion for summary judgment dismissing the complaint and the third-party complaints, should be affirmed, with costs.

KASSAL, J. (dissenting in part). The issue on this appeal is whether summary judgment, dismissing the complaint, should have been granted in this action brought to recover a real estate brokerage commission. On this record, I conclude there are sufficient factual issues for trial to preclude summary disposition. Among these issues are whether plaintiff was the procuring cause of the lease and whether it was deprived of its

commission by reason of bad faith on the part of either the tenant, the landlord or both.

Aegis Property Services Corp. (Aegis) claims it is entitled to a real estate brokerage commission of $60,000 as a result of a lease entered into on December 5, 1980, between Hotel Empire Corp. (Empire), as landlord, and Imero Fiorentino Associates, Inc. (Imero), as tenant, which lease recited that another broker, Lansco Corporation (Lansco) was the sole procuring broker entitled to a commission. The complaint asserts two causes of action, the first for breach of contract to recover the commission based upon the reasonable value of plaintiff's services and, the second, alleging a conspiracy between Empire and Imero to defraud plaintiff and deprive it of its brokerage commission.

On April 6, 1979, Martin Stern, employed by Aegis as a real estate broker, met with Imero's vice-president, George Honchar, to discuss Imero's need for different office space in the vicinity of Lincoln Center. Within a matter of days, Stern was given permission by Empire to show space in the Hotel, located at Broadway and 63rd Street, across the street from Lincoln Center. Stern claims that on April 6, 7 or 8, 1979, he confirmed the availability of 14,000 square feet of space in the mezzanine level of the Hotel and, as the result of a meeting with Empire's employee, ascertained that the Hotel sought to rent the space "as is," at $7 per square foot. Stern secured a floor plan for the space and submitted it to Imero. Subsequently, on June 19, 1979, Stern suggested that Imero inspect the premises and, two weeks later, on July 5, 1979, he showed the space to Honchar and advised Imero to make an offer. He claims that as early as April, 1979, Imero's president, Imero Fiorentino, authorized him to negotiate a deal and, as a result, he told Empire that he had a client who was interested in the space. Thereafter, and well into 1980, plaintiff expended further efforts to encourage Imero to consider the mezzanine space at the Hotel.

In March, 1980, Imero retained an accounting firm to perform auditing services, following which, Robert Bell, a partner in that accounting firm, acted as consultant to aid Imero in searching for suitable space. Stern, who claims he worked closely with Bell, showed him between 12 and 20 spaces in the midtown, west side area, but continuously suggested that Bell consider the mezzanine space at the Hotel Empire.

It appears that the same relationship between the parties continued until July, 1980, when Bell advised Aegis that he was dissatisfied with plaintiff's performance and, as a result of adverse financial circumstances, Aegis should discontinue its

search for office space on Imero's behalf. However, immediately following Aegis' discharge, Bell, on Imero's behalf, retained Lansco as its real estate broker and, on July 15, 1980, Lansco delivered to Bell a survey of available space which included the mezzanine premises within the Hotel Empire. Aegis claims that Imero made subsequent visits to the space and negotiations were immediately undertaken, culminating in Imero's signing a lease on December 5, 1980, on terms substantially similar to those originally proposed by Stern.

In suggesting that there existed an ongoing scheme to deprive Aegis of any commission which would have been earned, plaintiff emphasizes that Lansco was retained almost immediately after Aegis had been discharged. Bearing in mind the assertion that Aegis had been advised by Imero to discontinue any further search because of adverse business conditions, the immediate retention of Lansco does pose an inconsistency. In addition, it appears that, during the period, Bell had an ongoing relationship with Lansco, with whom he had prior dealings, and kept Lansco advised as to plaintiff's activities on Imero's behalf. He also inspected space suggested to him by Lansco, which is not unusual, considering that Aegis did not have an exclusive arrangement with Imero.

However, the immediate retention of Lansco after Aegis' discharge and the clear reversal in position on the part of Bell and Imero as to the feasibility of the Hotel Empire space do present factual issues. Whether the Aegis' activities were sufficient to make it the procuring cause of the lease and whether it acted to create a chain of circumstances which proximately led to the lease ultimately entered into cannot be determined solely on the affidavits presented. Also critical to the issue is the allegation that Bell, as Imero's agent, and Lansco acted in bad faith to deprive Aegis of a commission and tortiously interfered with the efforts by Aegis to effect a landlord-tenant relationship between the parties. These are factual issues more appropriately for the trier of the facts.

Generally, in the absence of an agreement to the contrary, a party who seeks to recover a real estate brokerage commission must establish that it was the procuring cause of the sale or lease in that there was a purchaser or lessee ready, willing and able to buy or lease the property on terms acceptable to the seller or lessor (*Lane-Real Estate Dept. Store v Lawlet Corp.*, 28 NY2d 36, 42; *Hecht v Meller*, 23 NY2d 301, 305; *Levy v Lacey*, 22 NY2d 271, 274). To sustain his claim to a fee, the broker must establish that he brought the parties together and instigated the

relationship which eventually culminated in the execution of a lease. The entitlement to a fee is not affected by the fact that the broker did not participate in the actual negotiations between the parties (*Busher Co. v Galbreath-Ruffin Realty Co.,* 22 AD2d 879, affd 15 NY2d 992; *Salzano v Pellillo,* 4 AD2d 789). As we observed in *Busher* (*supra,* p 879), the operative standard is whether the broker "generated a chain of circumstances which proximately led to the ultimate lease of the premises." In that case, we affirmed the holding that the proof at trial showed that the broker "brought the parties together and instigated a proper attitude toward the possible lease" (*supra,* p 879). We concluded that the fact that the broker did not thereafter participate in the negotiations would not deprive him of his right to a commission. (See, also, *Salzano v Pellillo, supra; Gale v Independent Textile Dyeing Co.,* 13 AD2d 1006.) The observation by the Court of Appeals in *Lane-Real Estate Dept. Store v Lawlet Corp.* (28 NY2d 36, 44, *supra*) is instructive as to the proof generally necessary to make out a prima facie case: "Consequently, all a broker need do to establish a prima facie case is to introduce evidence tending to show the existence of a commission agreement and that he has procured a ready, willing and able purchaser at the price and terms of the seller. These are all questions of fact and as such must be resolved by the jury."

As applied here, it is undisputed that Aegis initially introduced Imero to the space in the Hotel Empire. Aegis showed the space on at least two occasions, secured a floor plan for the premises and actively sought to induce Imero to consider the space and make an offer. While defendants now contend that Imero had no interest at that time, it is certainly suspect that the apparent lack of interest was rekindled vigorously almost immediately upon Aegis' discharge and Lansco's retention. The claimed reason given for plaintiff's discharge — adverse economic conditions — is refuted by the fact that Lansco was hired almost immediately thereafter and, within a few weeks, submitted a survey of available space which included the same mezzanine premises in the Hotel Empire.

Furthermore, taking into account the close relationship between Bell and Lansco, there is an additional factual issue here as to whether there had been bad faith in seeking to deprive Aegis of any commission (cf. *Goodman v Marcol, Inc.,* 261 NY 188). In *Goodman,* after the broker had procured a prospective purchaser and negotiations had been entered into, the seller, objecting to the amount of the commissions, discharged the broker and retained another to consummate the sale. The court concluded that there were questions of fact which should have

been submitted to the jury, including whether the termination of authority by the principal was in bad faith, designed to deprive the broker of his commission. While the factual situation in *Goodman* may be clearer with respect to the application of the rule than here, nevertheless, with these allegations and under the circumstances, the issue of whether there was bad faith here is for the trier of the facts.

*Greene v Hellman* (51 NY2d 197), relied upon at Special Term, is distinguishable. In that case, following a nonjury trial, the Court of Appeals reversed and dismissed the complaint, finding that the broker had no authority from the owner to sell the property and that he was not the procuring cause of the sale. In *Greene,* all the broker did was bring the property to the attention of the ultimate purchaser, which was found to be insufficient to entitle the broker to a commission, a rule long recognized in this State (see *Newberry & Co. v Warnecke & Co.,* 267 App Div 418, 421, affd 293 NY 698).

In our case, the record reflects that Aegis did much more, namely, it arranged for meetings between the parties, secured a floor plan, showed the space to Imero on at least two occasions and actively encouraged Imero to accept the offering price of $7 per square foot. It is also relevant that the lease eventually entered into between Imero and Empire was on terms substantially similar to those which plaintiff had obtained.

Under the circumstances, bearing in mind the limited judicial function on a motion for summary judgment as issue finding, not issue determination, the several factual issues should await the trial. Summary judgment is a drastic remedy, which should not be granted where there is any doubt as to the existence of a triable issue (*Moskowitz v Garlock,* 23 AD2d 943, 944) or where the issue is even arguable (*Barrett v Jacobs,* 255 NY 520, 522).

However, I do agree with so much of the majority's determination sustaining the dismissal of the second cause of action, based upon the theory of a conspiracy to defraud Aegis and deprive it of its commission. It is well established that there is no tort of conspiracy, and, as held at Special Term, one party to a contract does not have a cause of action for conspiracy to breach the contract against the other party to the agreement (*Bereswill v Yablon,* 6 NY2d 301; *Turntables, Inc. v M.B. Plastics Corp.,* 31 AD2d 792; *Caprice Imports v Soc. Acc. Semplice Calzaturificio Vibelsport Di Vibelli & C.,* 13 AD2d 952). Inasmuch as the broker was retained by Empire, the only remedy available to Aegis against the lessor was to proceed, as it did in the first cause of action, for breach of contract. However, as against

Imero, a cognizable claim for relief does exist for tortious interference with contract (see *Hornstein v Podwitz,* 254 NY 443). Bearing in mind the liberality by which leave to amend should be granted under CPLR 3025 (subd [b]), plaintiff should be permitted to replead as against Imero to interpose a claim for tortious interference with contract.

Therefore, the third-party complaint should be reinstated, affording such relief not only as to Imero, which has taken a protective cross appeal, but also as to the nonappealing party, Hotel Empire (see *Cover v Cohen,* 61 NY2d 261, 277-278).

Accordingly, the judgment, Supreme Court, New York County (Alvin Klein, J.), entered May 2, 1984, on an order of said court entered January 24, 1984, granting Lansco's motion for summary judgment dismissing the complaint and the third-party complaints and Imero's cross motion for summary judgment dismissing the complaint, should be modified, on the law, to reinstate the first cause of action and the third-party complaints and with leave to plaintiff to replead the second cause of action as against Imero to allege a cause of action for tortious interference with contract, and otherwise affirmed.

SULLIVAN and BLOOM, JJ., concur with SANDLER, J. P.; ASCH and KASSAL, JJ., dissent in part in an opinion by KASSAL, J.

Order, Supreme Court, New York County, entered on January 24, 1984, and judgment of said court entered thereon on May 2, 1984, affirmed. Hotel Empire Corp. and The Lansco Corporation shall recover of Aegis Property Services Corp. and Imero Fiorentino Associates, Inc., one bill of $75 costs and disbursements of these appeals.