**CONSUMERS SUBSCRIPTION CENTER, INC., Plaintiff,**

**v.**

**WEB LETTER COMPANY, Tri-State Envelope Corporation, ICS Corporation, and Ballantine Litho-Sales, Inc., Defendants.**

**No. 82 CV 390.**

United States District Court, E.D. New York.

May 22, 1985.

Norman A. Kaplan, Great Neck, N.Y., for plaintiff.

Meinhardt & Kightlinger, by John D. Kightlinger, Arlington Heights, Ill., for Web Letter Co.

Byron Golden, New York, N.Y., for Tri-State Envelope Corp.

Anthony J. McNulty, Media, Pa., for ICS Corp.

Ruden & Cramer, P.C., by Martin R. Cramer, New York, N.Y., for Ballantine Litho-Sales, Inc.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

Plaintiff commenced this diversity action to redress defendants' alleged breaches of contract. The case is before the Court upon each defendant's motion for summary judgment. Consequently, in this context the facts are related as they appear in plaintiff's opposing papers.

Stripped of its hyperbole and numerous immaterial conclusions of law, the affidavit of Bernard Gelb, plaintiff's director of operations, recites plaintiff's version of the events which led to this litigation. Gelb is also president of plaintiff's parent company, Consumers Subscription Service, Inc., and functions as the printing buyer for these entities and the Sears Subscription Service, which plaintiff also operates. These businesses merchandise discount magazine subscriptions through the mails from an office located in Queens. A magazine sweepstakes promotion scheduled to be mailed in mid-1981 furnishes the backdrop for the instant dispute.

In April 1981 Tom Cote Jr., an employee of Ballantine Litho-Sales, Inc. (Ballantine), obtained the artwork and graphics necessary for the job. As Gelb understood the arrangement, Tri-State Envelope Corp. (Tri-State) would print the outer envelope, which would contain a letter printed by Web Letter Co. (Web), a brochure printed by Slate Printing Co. (Slate) and a reply card printed by ICS Corp. (ICS). After the suit's inception, Slate was removed from the litigation by way of the bankruptcy court.

On May 11, 1981 Cote sent a letter to Gelb which states:

"Attached are the five contracts regarding your next printing jobs.

"Please sign where indicated."

Although unsigned, the letter appears on Ballantine's stationery and was accompanied by six pages of typewritten documents, also on Ballantine's stationery. Only three of these pages are signed by Cote, and all six appear to be signed almost

illegibly by Gelb. The first page, addressed to Gelb and dated May 11, 1981, states:

I am pleased to quote the following based on our understanding of your specifications as outlined below:

| | |
|---|---|
| **Title:** | Spring Mailing |
| **Product:** | Brochure   – 2 Sheets |
| **Est. #** | 81 – 253a |
| **Quantity:** | 2MM – 3MM |
| **Size:** | 7" x 10" |
| **Stock:** | 35# offset opaque |
| **Colors:** | 4C/4C – bleeds |
| **Art:** | Final film supplied |
| **Proofs:** | Transfer key and blueprints |
| **Bindery:** | Nested and folded to fit #9 |
| **Packing:** | In cartons on skids |
| **Shipping:** | F.O.B. Plant |

*100 Fold 5x7* (handwritten)

| **Prices:** | **2MM** | **3MM** |
|---|---|---|
| | $18.52/M | $18.08/M |

Sincerely,

Thomas C. Coté

TCC:lk
Accepted by _____

---

The second page, undated, is in similar typewritten form. It refers to an "Envelope" and notes a "Size, Stock, Colors, etc." as before. The quantity and prices were expressed as follows:

"Quantity:  50M – 100M – 1MM – 2MM – 3MM

| Prices: | 50M | 100M | 1MM | 2MM | 3MM |
|---|---|---|---|---|---|
| 24# br. krft.. | .$34.25/M | $29.65/M | $18.55/M | $17.10/M | $16.75/M |
| 24# bag krft.... | $33.70/M | $29.10/M | $18.00/M | $16.55/M | $16.20/M |
| 20# deduct $.35/M | | | | | |

---

A handwritten ellipse has been drawn around "$34.25/M." The third page bears a number 2 and refers to a mailing envelope. Again, "Size, Stock, Colors," etc. are noted and the quantity and prices are:

"Quantity:    1MM - 2MM"

1MM....$9.60/M        2MM.......$9.50/M  — *24# Brown Kraft*

*2mm... 9.00/M - 20# " "*

---

The fourth page bears a number 3 and refers to an outer envelope. Once again the format and arrangement are as before and the prices and quantities are similar to page 2, viz.,

"Quantity:    100M - 1MM - 2MM"

| Prices: | 100M | 1MM | 2MM |
|---|---|---|---|
| 28# brown kraft....$21.15/M | | $14.95/M | $14.25/M |
| 24# brown kraft....$19.95/M | | $13.50/M | $12.50/M |
| 20# brown kraft...$19.00/M | | $12.55/M | $11.60/M |

---

A handwritten ellipse has also been drawn around $19.00/M. The fifth page resembles the first page except that it is dated May 12, 1981 and refers to a "Return Envelope." The quantity and prices are:

"Quantity:    1MM - 2MM"

"Prices:    1MM......$7.10/M    2MM.....$6.90/M"

---

The sixth page, which refers to a "Letter," resembles the first with quantity and price noted as follows:

"Quantity:    2MM - 3MM

"Prices:    2MM        3MM"

         $6.12/M      $5.89/M

Notably, too, none of the pages refers to any of the defendants except Ballantine.

According to Gelb, as had been their practice in the past, Cote kept a set of these documents, referred to by Gelb as contracts, which set "had the specific number required to be printed, underlined and initialed on each and every contract." Gelb affidavit ¶ 12 at p. 6. Gelb's confidence that "business as usual" was proceeding was bolstered by William Able, Ballantine's production manager. On May 15, 1981 Able reported that he was ordering paper for the project, confirmed the quantity, the paper stock, and the ink colors, and identified the printers, Slate, Web, Tri-State, ICS, of each piece of the mailing.

Abruptly, however, on May 22, 1981 Cote and his father visited plaintiff's office on behalf of the other defendants and represented that they wanted cash in advance for the job. This dispute was seemingly resolved, and Gelb contacted Cote later that day to review the progress of changes Ballantine was to make on the artwork and film supplied by plaintiff. Cote stated the project would go ahead and that the printers had ordered paper. On May 28, 1981, however, Cote telephoned Gelb to tell him that Ballantine would not complete the balance of the work on the film and art and the printers would not commence the job. Additionally, the return of plaintiff's film and art would require payment in advance

for the work already done. By June 3, 1981 plaintiff had retrieved the art and film and the next day, by mailgram, Gelb notified each of the printers that its agent, Ballantine, had made a contract for the respective item.

> "Ballantine has broken the contract and states that you did not deliver. If you do not deliver the merchandise in accordance with the contract we will bring a lawsuit against you for breach of contract."

Gelb affidavit ¶ 15 at p. 9. Before Gelb carried out his threat, he received a telephone call on June 7, 1981 from Richard Pendergast, vice-president of ICS, who acknowledged receipt of the mailgram and the agency relationship with Ballantine.

> "Mr. Pendergast stated that his company wanted to perform the printing in accordance with the contract, but he (ICS) was instructed by Ballantine not to do the printing because all the other printing companies would then be required to perform and do the printing also. Mr. Pendergast indicated that he understood he was legally responsible, but Ballantine was giving him (ICS) a lot of business and Ballantine was more important to him than Consumers.

> "Mr. Pendergast even mentioned that any amount he would lose in a law suit would not be as great as the loss of Ballantine to his company. Mr. Pendergast acknowledged that he had done printing for Consumers in the past and that there were no outstanding balances. I told him he would be hearing from my attorney."

Gelb affidavit ¶ 18 at p. 11.

Before evaluating the various defenses and arguments made in support of each defendant's motion for summary judgment, the Court will respond to matters raised in the papers but not germane to this stage of the litigation. Despite the record of Gelb's behavior concerning this or unrelated litigation in this Court, his credibility is not at issue in this motion. In the same vein, Gelb's affidavit is replete with an assortment of opinions and legal conclusions which are not admissible testimony under Fed.R.Civ.P. 56(e), and which, therefore, must be treated as surplusage.

Turning to the merits, plaintiff bases its right to recovery on the theory that Ballantine acted as an agent to bind the other defendants to contracts for various printed matter. In response, the defendants have raised issues of agency and contract law.

New York U.C.C. § 2–201(1) provides:

> "Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."

> "It is clear that, in order to satisfy [this] Statute of Frauds provision, the writing need not contain all the material terms of the agreement. Indeed, there are only three 'invariable requirements' that a writing must meet. 'First, it must evidence a contract for the sale of goods; second, it must be "signed", a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity' (Uniform Commercial Code, § 2–201, Official Comment No. 1)."

*Horn Waterproofing Corp. v. Horn Construction Co., Inc.*, 104 A.D.2d 851, 480 N.Y.S.2d 367, 369 (2d Dept.1984) (memorandum).

The face of plaintiff's written memoranda are at best ambiguous about specifying the quantity of goods in the alleged contract. The ambiguity is not clarified by the complaint, which alleges no quantity at all for the contracts with Slate, Tri-State, and Ballantine and a quantity of 2,000,000 for the contracts with ICS and Web. Gelb's testimony is the only evidence

offered to clarify which of the various quantities listed on the written memoranda is the quantity that the parties allegedly agreed upon. The Court need not rest its ruling on that point, however, because plaintiff premises its claim upon an agency relationship which it must prove. *See Sponge Rubber Products Co. v. Purofied Down Products Corp.*, 281 A.D. 380, 119 N.Y.S.2d 783, 785 (1st Dept.1953), *aff'd* 306 N.Y. 776, 118 N.E.2d 479 (1954). Assertedly, this relationship arises from the apparent authority of Ballantine to enter into contracts for printing on behalf of the other defendants. The lack of Ballantine's actual authority to so act is undisputed.

"Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority. 'Rather, the existence of "apparent authority" depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal—not the agent.' Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable."

*Hallock v. State*, 64 N.Y.2d 224, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178, 1181 (1984) (citations omitted).

"One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority."

*Ford v. Unity Hospital*, 32 N.Y.2d 464, 472, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973) (citation omitted). This maxim is particularly applicable to Web, with whom Gelb has had no prior business dealings on behalf of any of the magazine subscription entities with which he is associated. Gelb was not entitled to rely upon Cote's representation of the agency relationship as giving rise to Ballantine's authority to bind Web to contracts for printed materials.

*See Chelsea National Bank v. Lincoln Plaza Towers*, 93 A.D.2d 216, 461 N.Y.S.2d 328, 331 (1st Dept.1983). That Cote had stated that for this job, Web would act as a substitute printer for Slate, with whom Web had some business relationship, is equally insufficient. Similarly Gelb's conversation with Ballantine's employee, Bill Able, does not constitute conduct or representations by Web. *See id.*

At his deposition Gelb testified that either 2 weeks before or 2 weeks after the signing of the writings sent by Ballantine, he vaguely recalled that he may have discussed this project on the telephone with someone, "a production type person", at Web. This testimony does not establish Ballantine's authority to bind Web to a contract for anything. Additionally, Gelb's receipt of paper samples from Allied Paper, Inc., Web's supplier, also does not constitute evidence from which the trier of fact may conclude that Web had misled Gelb into believing that Ballantine had authority to bind Web to a contract. The caselaw requires proof that Web's conduct induced Gelb to believe that Ballantine could make a contract on Web's behalf. *See Greene v. Hellman*, 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 412 N.E.2d 1301 (1980) ("Key to the creation of apparent authority is that the third person, accepting the appearance of authority as true, has relied upon it."). In this case, according to Gelb, the contract or agreement arose on the signing of the May 11 and 12, 1981 memoranda, Gelb affidavit ¶ 12 at p. 6, an event which was prior to the sending of the paper samples, possibly prior to any telephone conversation Gelb had with an unidentified individual at Web, and prior to Ballantine's representations that Web had ordered paper. Given the series of events as Gelb claims they occurred, there is no dispute that he could not have relied upon, and did not rely upon, those events to conclude that Ballantine had authority to bind Web to a contract.

For the foregoing reasons, the Court finds that there is no genuine issue as to any material fact and that Web's motion for summary judgment should be granted.

Unlike Web, defendants Tri-State and ICS have previously transacted business with Gelb, but not with plaintiff.

"[W]here an agency is sought to be established by a prior course of dealing, such conduct determines the extent of the agency as well as its existence." *O.A. Skutt, Inc. v. J. & H. Goodwin Ltd.*, 251 A.D. 84, 295 N.Y.S. 772, 776 (4th Dept. 1937); *accord Kentucky-Pennsylvania Oil & Gas Corp. v. Clark*, 247 Ky. 438, 57 S.W.2d 65, 70 (1933) ("To constitute binding precedents, transactions must not only be of similar things done, but of things done in a similar way. Mechem on Agency, § 263.").

The evidence submitted by plaintiff discloses that the instant series of events did not constitute "business as usual" and did not parallel Gelb's prior transaction with Tri-State. Exh. 14 to Gelb's affidavit is an acknowledgment form from Tri-State to Consumers Subscription Service Inc., at plaintiff's address, attention: Bernie Gelb. It is dated July 11, 1980, and contains specific terms for quantity, style, price, paper, shipping, delivery, and printing specifications for 1,000,000 envelopes. Exh. 25 to Gelb's affidavit consists of a set of papers, among them an invoice from Tri-State dated August 22, 1980, for 260,000 envelopes sold to Sears Subscription Service, the cancelled check Gelb remitted in response to this invoice, an invoice dated August 6, 1980, for the envelopes mentioned in Exh. 14, supra, and the shipping documents for those envelopes. In a reply affirmation, Joseph R. Harbeson, an attorney representing Tri-State, reiterates that the acknowledgment form evidences the manner in which Tri-State conducts business as detailed in the affidavit of John Swensen, a salesman for Tri-State. Brokers such as Ballantine are authorized to solicit business for Tri-State, a large envelope printer with plants located in four states. The broker furnishes price quotations, but the acceptance of the job comes directly from Tri-State, which, like other printers, cannot agree to fulfill an order until it knows the terms proposed by the customer. Specifically, as Swensen explains, a delivery date is crucial because only then can Tri-State determine that it has or will have the necessary materials and printing capacity to complete the job by the time requested. For this reason, brokers do not have authority to enter into contracts on behalf of Tri-State.

In the instant case Gelb has not produced any acknowledgment form from Tri-State for the alleged contract nor does he assert that one was received. This circumstance compels the inference that Tri-State adhered to its usual business practice. Additionally, the documents offered by Gelb as the written memoranda of the contract also support this conclusion. Among other missing terms, they lack the delivery term which Tri-State has demonstrated is integral to its decision to accept business. In light of Gelb's evidence, his prior dealing with Tri-State confirmed that Ballantine was not an agent empowered to bind Tri-State to a contract. *See* Restatement Agency 2d § 50 comment b ("Authority to contract is not inferred from authority to solicit business for the principal nor from authority to perform acts of service for the principal."); *compare Franhan Distributors, Inc. v. New York World's Fair 1939, Inc.*, 124 F.2d 82, 85 (2d Cir. 1941), *cert. denied*, 316 U.S. 687, 62 S.Ct. 1277, 86 L.Ed. 1759 (1942).

As previously mentioned, in his affidavit Gelb relates a telephone conversation he had with Richard Pendergast, vice president of ICS. ICS neither acknowledges nor responds to this testimony in any of the papers submitted on this motion. ICS's answer, however, suggests that it is aware of Gelb's version of the conversation, but that his version is not accurate.

"12. Specifically denies each and every allegation contained in paragraph 29 of the Complaint, that the Defendant failed to deliver said Order/Entry cards although Plaintiff has demanded said delivery; on the contrary, when Plaintiff telephoned Defendant long distance from New York to Philadelphia and followed-up same with a telegram, that the parties

had not entered into a contract and that the Defendant did not intend to enter into a contract with the Plaintiff to deliver said cards."

Testimony similar to Gelb's, although that of an interested witness, has been found adequate to submit the case to the trier of fact on the theory that the principal ratified the unauthorized act of the agent. *See e.g., Beck v. Freund,* 117 N.Y.S. 193, 195 (N.Y.App.Term 1909); *Carroll v. Farley,* 113 N.Y.S. 478 (N.Y.App.Term 1908) (per curiam); *Henry Hess & Co. v. Baar,* 14 Misc. 286, 35 N.Y.S. 687 (N.Y.Common Pleas 1895).

■ To satisfy the statute of frauds, plaintiff's written memoranda must also evidence a contract for the sale of goods. That contract must be the contract that plaintiff claims was made and not some other contract. *See e.g., Schaefer v. Alvarez,* 249 N.Y. 117, 118, 162 N.E. 603 (1928) (per curiam); *Saff Textile Corp. v. Sutton,* 280 A.D. 597, 116 N.Y.S.2d 137 (1st Dept. 1952) (per curiam).[1] As ICS points out, nothing in the proffered memoranda refers to the order/entry cards which Gelb claims were to be printed by ICS. Complaint ¶ 27. He ascribes this discrepancy to a mistake on one of the memoranda. In the context of summary judgment, Gelb's testimony regarding Pendergast's purported admission overcomes a discrepancy that would otherwise be fatal. While it is not mandatory to afford plaintiff an opportunity to exact an admission from the defendant that a contract was made, *see Boylan v. G.L. Morrow Co., Inc.,* 63 N.Y.2d 616, 618, 479 N.Y.S.2d 499, 468 N.E.2d 681 (1984) (memorandum), in this case plaintiff, who has not yet deposed Pendergast, claims that ICS made such an admission. In *Radix Organization, Inc. v. Mack Trucks, Inc.,* 602 F.2d 45 (2d Cir.1979) the Court stated,

"Pursuing their argument under section 2–201(3)(b), appellants assert that they are entitled to proceed to trial in order that they may attempt to secure from a defense witness an admission that an oral contract was made. Appellants have had ample opportunity for full discovery, and there is no indication that such an admission has been made or is likely to be made. Indeed, appellees' consistent position has been that there was no contract. Appellants' unsubstantiated hope that, if permitted to go to trial, they can turn appellees' denials into admissions is not sufficient to preclude summary judgment."

*Id.* at 48 (citation omitted). In this case, however, there is an indication that "such an admission has been made." The Court cannot surmise the degree to which Pendergast may contradict or corroborate Gelb's testimony. As a result, plaintiff has raised a genuine issue of material fact regarding the existence of a contract between it and ICS. ICS's motion for summary judgment must therefore be denied.

■ With the exception of the fifth cause of action, which charges Ballantine with failure to deliver printed material according to an agreement of May 11, 1981, each cause of action alleges that Ballantine acted as an agent for the other defendants. Complaint ¶¶ 8 (Slate), 14 (Web), 20 (Tri-State), 26 (ICS). In response, Ballantine relies on the rule that

"an agent for a disclosed principal 'will not be personally bound unless there is clear and explicit evidence of the agent's intent to substitute or superadd his personal liability for, or to, that of his principal.'"

*Savoy Record Co. v. Cardinal Export Corp.,* 15 N.Y.2d 1, 4, 254 N.Y.S.2d 521, 203 N.E.2d 206 (1964) (citation omitted).

---

**1.** Although these cases were determined on the basis of N.Y. Personal Property Law § 85, which preceded § 2–201 of the UCC, it is apparent from the New York practice commentary that the UCC has not eliminated this requirement, viz.,

"2. Both sections normally require, as specified in subsec. (1) of this section, 'some

writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker', although Personal Property Law § 85 used slightly different language of the same meaning ..."

Under this rule, the burden of proof lies with plaintiff to overcome the presumption that the agent intends to bind the principal and not himself. *RKO-Stanley Warner Theatres, Inc. v. Plaza Pictures*, 54 A.D.2d 623, 387 N.Y.S.2d 257, 258 (1st Dept.1976) (memorandum), *mot. lv. to appeal denied*, 41 N.Y.2d 801, 393 N.Y.S.2d 1025, 361 N.E.2d 1051 (1977); *see Sweeney v. Herman Management, Inc.*, 85 A.D.2d 34, 447 N.Y.S.2d 164, 166 (1st Dept.1982). Plaintiff offers no evidence on this point, citing instead UCC § 3–403(2)(a) which concerns the obligation of an authorized representative who signs his own name to an instrument. Under UCC § 3–102(1)(e) an "instrument" means a negotiable instrument, which clearly was not the nature of the transaction alleged in the complaint.

Plaintiff concedes that it was aware of the identities of the principals and has relied upon past dealings and their alleged acts to establish Ballantine's authority. This reliance is merely a vehicle offered to excuse plaintiff's failure to inquire of the principals whether Ballantine actually had such authority. Indeed, plaintiff inferentially concedes as much by changing his theory of recovery to one not contained in the complaint. Plaintiff asserts that Ballantine may be held liable for breach of the implied warranty of authority, *see Broughton v. Dona*, 101 A.D.2d 897, 475 N.Y.S.2d 595, 596 (3d Dept.1984) (memorandum); however, the complaint alleges only the breach of a contract for the printed materials that were to be furnished by the other defendants.

Inasmuch as plaintiff understood that Ballantine would not actually produce the finished products itself, plaintiff again shifts its attack to a charge that Ballantine induced a breach of contract. Plaintiff specifically points to the telephone conversation in which ICS's vice president states that he will not perform at Ballantine's behest. To reiterate, however, the complaint is limited to the claim that Ballantine breached a contract *and nothing more.*

"[I]n the absence of allegations that suggest the agent committed a separate tort in conjunction with the breach or that it personally profited as a result thereof, the pleadings are defective insofar as they seek to assert a cause of action against the agent [Ballantine] for inducing the breach of the contract between plaintiff and [Ballantine's alleged principals]."

*Marcraft Recreation Corp. v. Frances Devlin Co., Inc.*, 459 F.Supp. 195, 198 (S.D. N.Y.1978). For the foregoing reasons, Ballantine's motion for summary judgment is granted.

In summary, with the exception of defendant ICS Corporation, the defendants' respective motions for summary judgment are granted. As between plaintiff and ICS the Court orders as follows:

1. Discovery will end by Wednesday June 12, 1985.

2. Trial by jury will commence promptly at 2 p.m. on Monday, June 24, 1985.

3. The jury will be selected by a United States Magistrate on Monday June 17, 1985 at a time to be arranged by the magistrate.

4. On or before Wednesday June 19, 1985 the parties will contact the Court's courtroom deputy clerk, Mrs. Rose Hounsell, to arrange for the premarking of exhibits.

5. By Friday June 14, 1985, each party will submit a pretrial order consisting of a list of the witnesses intended to be called at trial, a list of the exhibits intended to be offered at trial, and a statement of any material undisputed facts which may expedite the trial of the cause.

The above dates are not subject to adjournment.

SO ORDERED.