[639 NYS2d 1012]

CUSHMAN & WAKEFIELD, INC., Appellant, v 214 EAST 49TH STREET CORP., Respondent.

First Department, April 2, 1996

APPEARANCES OF COUNSEL

*David H. Gikow* of counsel (*Lehman & Gikow, P. C.,* attorneys), for appellant.

*Sidney Gottleib* for respondent.

**OPINION OF THE COURT**

WALLACH, J.

This is an action to recover a real estate brokerage commission. When defendant sought to sell its five-story building in 1985-1987 for $4.5 million, Stein, the building manager, approached Takeshi Okazaki as a prospective purchaser. Okazaki, who was president of a corporation which operated a restaurant at the premises and leased the first two floors, was not interested. Stein was unable to find a buyer.

In February 1988, defendant entered into a six-month exclusive brokerage agreement with plaintiff, whereby the latter would earn its 6% commission on any sale even after expiration of the period, provided that the property were "submitted" to the purchaser during the term of the agreement. The exclusivity agreement was subsequently extended for an additional two months, through October 26, 1988. Plaintiff was initially instructed not to approach Okazaki, despite his being a logical prospect, because the latter had already rejected an earlier offer. But in late August, during the two-month extension period, plaintiff received clearance from one of defendant's principals to approach the tenant again. Plaintiff's agent, Mark Bush, testified that at the first of two meetings with Okazaki, in September 1988, he reviewed the prospect in the light of an economic comparison between ownership and tenancy. Okazaki later rejected the offer because the asking price of $4 million was too high in comparison with other properties in the neighborhood. That was the extent of plaintiff's contact with Okazaki.

In May 1989, some seven months after expiration of plaintiff's contractual period of exclusive brokerage, Okazaki let it be known to Stein that his octogenarian father in Japan was interested in investment opportunities in New York City. (As early as February 1989, Okazaki had opened a joint account with his father in New York, in order to manage these local investments.) Stein raised the prospect of purchase of defendant's building, whose selling price would now be more attractive because of changed market conditions. At this price, Okazaki was interested. After obtaining power of attorney from his father (who spoke no English), Okazaki negotiated a purchase of the building for him in June at $2,230,000, arranged the financing, and entered into an informal agreement to continue renting the first two floors from the new owner while expand-

ing rent-free occupancy of the remainder of the premises. At the closing in August, Stein received a commission of $50,000.

At trial, plaintiff argued that defendant and Okazaki had engaged in a "tortious scheme" to deprive plaintiff of its rightful brokerage commission, casting Okazaki's father in a purely nominal role as purchaser of the property. But plaintiff has conceded that this is not a case of conspiracy or fraud; indeed, the complaint is couched in claims of breach of contract, quantum meruit and unjust enrichment. Nevertheless, plaintiff points to inconsistencies in Okazaki's testimony that raise questions as to his prior dialogue with Stein (in 1985-1987), the source of funding for the purchase, the true nature of the highly favorable new rental arrangement, and even the absent father's financial ability to make the purchase.

Our courts will scrutinize an alleged subterfuge designed to deny a real estate broker his rightful commission (*see, Rachmani Corp. v 9 E. 96th St. Apt. Corp.*, 211 AD2d 262). Notwithstanding Okazaki's testimonial inconsistencies (which may or may not be attributable to linguistic nuance), plaintiff has failed to prove any such subterfuge. There is nothing sinister about the interest of Okazaki's absentee father—a man of means, if not a "millionaire" by American standards—in dabbling in the New York real estate market, even if that resulted in a rental arrangement whose terms were, for Okazaki, a considerable improvement over its predecessor. The father's incentives for this investment were amply proven.

Even if the father was merely an alter ego of Okazaki for purpose of this acquisition, that still would not entitle plaintiff to judgment on this record. For well more than a century we have been guided by the principle that a broker's duty is to bring the minds of a buyer and seller to agreement on the sale (i.e., its terms and price), and until that is accomplished, no right to commissions accrues (*Sibbald v Bethlehem Iron Co.*, 83 NY 378). It is not enough simply to open negotiations between parties; unless the broker can produce a purchaser who is ready, willing and able to buy, under the terms as specified by the seller, he has done nothing to induce a purchase, and will not be entitled to a commission even if that prospect ultimately purchases the property (*Levy v Hayman*, 8 AD2d 854, *appeal dismissed* 8 NY2d 868).

The terms of plaintiff's brokerage employment contract entitled it to a commission if "at any time after the expiration or termination of this agreement a sale of all or any portion of the Property, upon any terms acceptable to us, shall be made

with any purchaser to whom the Property were submitted by C&W, or by us, or by any other person during the term of this agreement". This language substantially alters the common-law rights of a broker in its favor, relieving said agent of the requirement to bring its prospect to a meeting of the minds on all the essential terms of the ultimate transaction before a commission is earned. Under this contract, plaintiff simply has to show that it (or "any other person" Presumably, this could even include Stein, although it is clear that neither of Stein's "submissions" took place "during the term of this agreement".) "submitted" the property, during the term of the agreement, to the ultimate purchaser who closed the deal at any later time. But however broadly defined, this "submission" theory of recovery will not avail plaintiff here because it was Stein, rather than plaintiff, who had first submitted the property to Okazaki for possible purchase, long before plaintiff arrived on the scene. Under these circumstances, plaintiff, at this point no longer the "exclusive" broker, could only earn a commission if it satisfied the common-law requirement that it achieve a meeting of the minds between Okazaki and defendant on all the essential terms and conditions of the purchase. Admittedly, nothing of the sort ever occurred.

To prove plaintiff's entitlement, there must thus be a proximate link between the bare introduction of the parties and the consummation of the transaction (*Greene v Hellman*, 51 NY2d 197). Here, the link between plaintiff's unfruitful meetings with Okazaki in September 1988 and the latter's contract to purchase in June 1989 (eight months after expiration of plaintiff's exclusivity contract), on drastically different terms, is nonexistent. Plaintiff is reduced to intimating that Stein's overture may have been as early as January or February of 1989, in light of the fact that Okazaki opened the joint account with his father in February. The dissent accepts this intimation as established fact. But despite the vague recollection by defendant's principal of Stein's reference to such early discussions, Stein's testimony was quite firm that the subject had not been broached until May of that year. Even if negotiations had commenced in January, that would still have been three months after expiration of plaintiff's exclusivity contract.

Plaintiff was required to prove its case by a preponderance of the evidence. It failed to sustain that burden. Whatever testimonial inconsistencies there were, deference must be given to the Trial Judge in evaluating the credibility of witnesses, "unless it is obvious that the court's conclusions could not be

reached under any fair interpretation of the evidence" (*Claridge Gardens v Menotti*, 160 AD2d 544, 545). Where the record supports those conclusions, the standard has been met and our review function has been served (*Nightingale Rest. Corp. v Shak Food Corp.*, 155 AD2d 297, *lv denied* 76 NY2d 702).

The dissent is correct when it notes that this case was tried upon the supposition that the pretrial decision denying both parties' respective motions for summary judgment (Altman, J.) had narrowed the issues at trial, and that the quantum of plaintiff's brokerage services, however slight, was not in controversy before the trial court. Indeed, there was never any dispute as to the two brief visits made by plaintiff's salesman to defendant. But we are unable to conclude that the outcome of the parties' motion practice was to relieve plaintiff of its obligation to establish a prima facia case, or its obligation, if it were ultimately to prevail, to prove its case by a preponderance of the credible evidence. This Court, of course, is not bound by the doctrine of "law of the case" made on pretrial motions in reviewing a full record after trial (*Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 192 AD2d 83, 87-88, *affd* 84 NY2d 430). What is "determined" on a motion for summary judgment is the entitlement of a party to a pretrial judgment upon the affidavits and proofs *before the court at that time*, not the issues defined by the living testimony and proofs at trial (*Sackman-Gilliland Corp. v Senator Holding Corp.*, 43 AD2d 948, 949, *lv denied* 34 NY2d 515; *see also, Aufiero v New York Life Ins. Co.*, 74 NYS2d 277, 279, *affd* 274 App Div 928). By way of further example, proof offered to defeat a motion for summary judgment does not meet the standard of proof required to resolve an issue of fact at trial (*see, Jenks v McGranaghan*, 30 NY2d 475, 479 [Breitel, J.]).

We also reject the notion that under the guise of "interpretation", we have in reality rewritten the brokerage agreement. In our view, it is the dissent's misreading of the agreement which steps into this very trap. By the time plaintiff's salesman, Bush, called on Okazaki *fils* in September 1988, it is undisputed that defendant's manager, Stein, had already "submitted" the property to Okazaki for consideration, long before the "exclusive" agreement was signed, and all that Bush was providing were some comparative cost studies. In this context, what Bush was doing was *resubmitting* the property with some additional sales input. At this juncture, then, Bush's efforts fall outside the coverage of plaintiff's exclusive agreement, unless, with the reasoning adopted by the dissent, we

are required to translate "submit" as the equivalent of "*re*submit." We decline to rewrite the agreement in this fashion simply to bestow a $150,000 windfall on plaintiff for its marginal role in this salvage sale transaction.

Finally, on the factual aspect of the case, we are in complete agreement with the trial court's conclusion that plaintiff simply failed to prove any of its multiple theories of recovery by a fair preponderance of the credible evidence. The case could simply have been affirmed on this fully supported finding of the able and experienced Judge who conducted the bench trial.

Accordingly, the judgment of Supreme Court, New York County (Walter M. Schackman, J.), entered August 10, 1994 after nonjury trial, dismissing the complaint, should be affirmed, without costs.

MURPHY, P. J. (dissenting). The evidence adduced at the trial of this matter showed that after trying unsuccessfully for two years to sell its commercial building located at 214 East 49th Street through its managing agent, Harris Stein, the defendant, in February of 1988, entered into a brokerage agreement with plaintiff Cushman & Wakefield. That agreement provided in relevant part that plaintiff would have the exclusive right to sell the 214 East 49th Street property and that if the property was at any time subsequent to the agreement purchased by a prospect solicited within the agreement's term—initially six months and subsequently extended for an additional two months—plaintiff would be entitled to a commission amounting to 6% of the sale price. The agreement was explicit that plaintiff's right to a commission depended only upon its having submitted the property to the eventual purchaser within the agreement's term; the agreement did not exclude any prospective purchaser from its scope, nor did it require that the plaintiff be the procuring cause of the purchase and, indeed, specifically contemplated the circumstance that another broker might to some extent, perhaps greater than that of the plaintiff, play a role in the eventual sale of the property;[1] the

---

1. The contract provided, in relevant part: "If a licensed real estate broker other than C&W is the effective procuring cause of any sale covered by this agreement, C&W shall use its best efforts to have such other broker agree to accept, as its compensation, an equitable portion of the commission payable to C&W pursuant to this agreement, and if such other broker so agrees, we will pay C&W the commission set forth above out of which C&W will pay to such other broker its agreed upon share and retain the balance of the com-

parties explicitly agreed that this would not affect the plaintiff's right to its full 6% commission.[2]

The subject premises at 214 East 49th Street consisted of a five-story structure with approximately 1,500 square feet per floor. At the time of the brokerage agreement and prior thereto since 1983, the first two floors of the building were tenanted by Okazaki America, Inc. which operated a restaurant on the premises. Takeshi Okazaki was the president and sole shareholder of the restaurant corporation. Although Okazaki twice testified that he had not prior to the brokerage agreement been approached respecting the possibility of his purchase of the demised premises, Harris Stein, the managing agent, gave contrary testimony in which he indicated that Okazaki had been approached by him on several occasions and that Okazaki had always responded that he did not have the funds to make the suggested purchase. Be that as it may, it is clear that subsequent to the agreement, plaintiff, initially having been orally instructed not to solicit Okazaki—presumably because Okazaki had in fact already been approached by Stein who was by his own admission a close personal friend of defendant 214 East 49th Street Corporation's principal, Ben Odierno—sought and received permission to approach Okazaki. It is undisputed that plaintiff's agent, Mark Bush, thereafter met with Okazaki on two occasions during the pendency of the brokerage agreement and, in the course of those meetings, "submitted" the property to him stressing the considerable savings Okazaki would enjoy by owning as opposed to leasing. Indeed, Bush presented Okazaki with studies generated by plaintiff purporting to show that even at the then current asking price of $4 million Okazaki could, over the course of 10 years, save approximately $1.5 million by buying rather than continuing to

---

mission as C&W's compensation. If the other broker will not agree to accept, as its compensation, an equitable portion of C&W's commission, then our approval will be necessary if the proposal is to be further negotiated. In no event shall C&W be liable for the failure to obtain such other broker's agreement to accept, as its compensation, an equitable portion of the commission payable to C&W hereunder."

2. As noted (see, n 1, supra), in the event that another broker was the procuring cause of the sale, plaintiff undertook only to use its best efforts to persuade that broker to accept as payment an equitable share of its, the plaintiff's, commission; it did not agree to a diminution in the amount of the commission paid by the seller and accepted no liability for its failure to persuade the other broker to accept part of the commission as payment.

rent the premises. Okazaki, however, indicated that he believed the price at which the property was then being offered was too high and that he, in any case, had no funds for a down payment and, accordingly, made no offer to purchase. In early 1989, however, some three months following the expiration of plaintiff's exclusive, and at a time when real estate values were in precipitous decline, Okazaki contacted Stein purportedly on behalf of his, Okazaki's, retired octogenarian father, Hirokichi Okazaki, a Japanese national, who, it was said, was interested in investing some of his savings in the United States. It was in the context of this inquiry that Stein again broached the possibility of a purchase of 214 East 49th Street. Negotiations ensued between Stein and Takeshi Okazaki and more or less contemporaneously the Okazakis, father and son, opened a joint account at the New York branch of the Bank of Tokyo. A contract pursuant to which title to the premises was to be conveyed to Hirokichi Okazaki for $2,230,000 was signed in June 1989 and the transaction closed in August 1989. Only $300,000 of the purchase price was paid in cash; an existing first mortgage on the premises in the amount of $1,230,000 was assigned to Hirokichi Okazaki and the seller took back a $700,000 purchase-money mortgage to make up the remaining consideration. Stein received a brokerage fee of approximately $50,000 at the closing, an amount which it may be noted was significantly less than the 6% fee to which plaintiff would have been entitled had it been compensated pursuant to the above-described brokerage agreement.

Although the nominal purchaser, Hirokichi Okazaki played no direct role in negotiating or closing the deal. He never visited the United States in connection with the transaction and all matters requiring his participation were handled by Takeshi pursuant to a power of attorney. Hirokichi spoke no English and purportedly for this reason communicated with no one except his son respecting the purchase; even the lawyer who represented Hirokichi at the closing had never spoken with him. All the checks required for the closing were drawn on the Okazakis' joint account by Takeshi, and while the funds used for the closing apparently originated in Japan, there is absolutely no evidence establishing that they were traceable to Hirokichi.

Hirokichi's involvement was no more in evidence subsequent to the closing. So far as can be gathered, he played no role in the management or operation of the premises, nor was he

instrumental in satisfying the ongoing financial burdens of ownership; mortgage and tax payments as well as operational, management and capital expenditures were all made by Takeshi Okazaki from the aforementioned joint account which was funded as needed by contributions not from Japan but from the restaurant corporation. Indeed, there is no evidence of any contributions to the joint account from Japan, much less from Hirokichi, subsequent to the deposits used to facilitate the purchase. Apart from testimony as to some informal understanding between father and son that the son would see to the satisfaction of the ongoing financial, tax, and operational costs of the premises, there was no evidence of anything remotely resembling a rental agreement. It is in fact clear that the father received no rental return on his "investment" and that the costs borne by the son, which were in all respects identical to those arising as incidents of ownership, were significantly less than the father could have received had the premises been rented at market value.

The complaint seeks recovery of the 6% brokerage fee provided for in the above-described brokerage agreement. In this connection it is alleged in essence that although Hirokichi Okazaki was the nominal purchaser, Takeshi Okazaki was the purchaser in fact and, accordingly, that plaintiff's submission of the property to Takeshi within the term of the brokerage agreement sufficed to trigger its entitlement to a commission. Alternatively, plaintiff alleges that placing title to the premises in Hirokichi Okazaki's name was part of a tortious scheme to deprive plaintiff of the commission it was due.

Before trial, plaintiff moved and defendant cross-moved for summary judgment. The motion court denied both the motion and cross motion. As is here relevant, the court held that although plaintiff had not at the time of the motion made out a prima facie case establishing that Takeshi Okazaki or Okazaki America was the purchaser in fact, plaintiff had established that the property was submitted to Takeshi Okazaki within the term of the agreement and that if Takeshi Okazaki was, in the course of the ensuing litigation, found to have been the purchaser in fact "plaintiff would be entitled to its commission as a matter of law." In reaching this conclusion the court specifically rejected the contention made by the defendant in support of its cross motion for summary judgment that because Okazaki learned about the building's availability from Stein, the agreement should be read to exclude Okazaki as a prospect, noting, "[t]he Agreement gave plaintiff an exclusive right

to sell the building and the tenant Okazaki America, Inc. and its principal Okazaki were not excluded from its terms." Defendant took no appeal from the denial of its motion upon this ground and proceeded to trial with the understanding that the sole issue remaining for litigation was whether Okazaki or his corporation had been the actual principal on the purchase side of the transaction. Indeed, this was, in fact, the only issue litigated, the issue of the effect of Stein's pre-agreement overtures to Okazaki upon the plaintiff's right to recover having, as a practical matter, been consigned to legal oblivion by the motion court's unchallenged construction of the brokerage contract. And, of course, defendant, consistent with its evident and plainly correct understanding that the issue was no longer in the case, has not again pressed the point on appeal. It must come as a surprise then, not least of all to the parties themselves, that this Court, apparently not content with the course charted by the litigants, has *sua sponte* seen fit to exhume the issue and, having done so, to hold that, notwithstanding the plain and unambiguous language of the agreement affording plaintiff the exclusive right to sell the premises, Okazaki was nonetheless not a prospect whose solicitation within the agreement's term would trigger plaintiff's right to a commission.

Leaving aside the procedural curiosity of its address of an issue which, even if it retained some theoretical vitality until the appeal, was indisputably abandoned upon the appeal when its proper proponent, the defendant, failed to brief it as an alternative basis for affirmance,[3] the majority plainly errs in construing the Agreement to except Okazaki from those whom the plaintiff was entitled to solicit thereunder. As the motion court observed, and as is in any case unambiguous from the agreement itself, neither Okazaki nor anyone else was excepted from the scope of plaintiff's exclusive right to sell. It must be supposed that if defendant had intended to except Okazaki from those whom the plaintiff might solicit it would have done so in the agreement since Okazaki's corporation, the tenant of the premises to be sold, was the most obvious, indeed the only potential purchaser identified at the time of the agreement.

---

3. The failure to brief an issue on appeal, even an issue otherwise preserved in the record, is, of course, generally treated as tantamount to an abandonment (*see, e.g., Matter of Smith*, 91 AD2d 789; *Lamphear v State of New York*, 91 AD2d 791; *Enright v Eli Lilly & Co.*, 155 AD2d 64; *Ritta Personnel v Andrew F. Capoccia, P. C.*, 144 AD2d 196; *Kivort Steel v Liberty Leather Corp.*, 110 AD2d 950). No reason is given for treating this case as an exception.

Moreover, even if there was, notwithstanding the unambiguous and doubtless binding terms of the written agreement conferring upon plaintiff an unqualified exclusive right to sell, some informal agreement by plaintiff not to solicit Okazaki without defendant's permission, the record is clear that that permission was obtained. Okazaki having thereafter been solicited by plaintiff within the term of the exclusive, it ought to be plain that plaintiff's right to a commission upon the purchase of the premises by Okazaki or his corporation was established. There is quite simply no reasonable understanding of the parties' agreement much less of the agreement in combination with defendant's express permission that Okazaki be solicited by plaintiff within its term,[4] supportive of the majority's hypothesis that the agreement had no application where the solicitation of Okazaki was concerned. It bears repetition that "In adjudicating the rights of parties to a contract, courts may not fashion a new contract under the guise of contract construction (*Morlee Sales Corp. v Manufacturers Trust Co.*, 9 NY2d 16); rather, they are required to discern the intent of the parties, ' "to the extent that [the parties] evidenced what they intended by what they wrote" ' (*Laba v Carey*, 29 NY2d 302, 308). Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used (10 NY Jur, Contracts, § 193; *Hall & Co. v Orient Overseas Assoc.*, 65 AD2d 424, *affd* 48 NY2d 958)" (*Slatt v Slatt*, 64 NY2d 966, 967). When the parties to the present agreement provided without qualification that "In the event that * * * (ii) at any time after the expiration or termination of this agreement a sale of all or any portion of the Property, upon terms acceptable to [the seller], shall be made with *any purchaser* to whom the property was submitted by C&W * * * within the term of this agreement; then, * * * we agree to pay to C&W one (1) full commission computed and payable in accordance with the annexed Schedule" (emphasis supplied), they must be presumed to have said what they meant, and the natural, untortured meaning of the words employed was that plaintiff was to be paid its full commission

---

4. In light of the defendant's express agreement to the solicitation of Okazaki, the majority's reliance upon the distinction between "submission" and what it terms "resubmission", already tenuous in the extreme given the plain wording of the contract purporting to give plaintiff an exclusive right of sale, becomes altogether untenable.

if it submitted the property to *"any purchaser"* within the agreement's term. I would have thought that by so providing the parties had precluded, so far as language permits, the interpretation embraced by the majority. While the majority may for obvious reasons feel ill at ease resting its determination to affirm the judgment dismissing the complaint upon the factual record, the need for some surer dispositional footing does not justify substitution of a judicial contrivance for the plain terms of the parties' agreement.

Turning now to the record adduced for the singular and only relevant purpose of establishing whether Takeshi Okazaki or Okazaki America, Inc. was the purchaser in fact of the subject premises, the evidence overwhelmingly demonstrated Takeshi Okazaki and his corporation to have been the actual principals on the purchase side of the transaction, notwithstanding that title to the premises was transferred to Hirokichi Okazaki.

If Hirokichi's participation in the transaction had any other purpose but to facilitate his son's enjoyment of the benefits of ownership, indeed, to place his son for all practical purposes in the position of the owner, the motive is nowhere disclosed in the record. Plainly, the father had no independent economic incentive for the purchase. As noted, it was agreed that the father would receive no rental income from the son's use of the premises[5] and the purchase by the octogenarian father at a time when New York real estate values were in steep and indeterminate decline cannot have been justified as an investment from which the father could have nursed any reasonable expectation of turning an eventual profit. It is then curious that the majority should observe that "[t]he father's incentives for this investment were amply proven", for there was absolutely no discernable economic incentive for the 84-year-old father to sink nearly one third of his savings into a New York property whose market value was plummeting[6] and from which no rental return was to be realized. If, as is suggested, the father derived some tax advantage from the "investment",

---

5. In this regard, it ought to be pointed out that the son's business, subsequent to the transfer of title, occupied the entire building, not just the first two floors, and did so rent free; while the business directly covered the expenses of maintaining the premises, as would an owner, it remitted nothing to the nominal owner much less any sum resembling a market rate rent.

6. Mr. Odierno, the seller's principal, described the real estate market at the time of the sale in his testimony as follows: "The market was falling very, very rapidly, and there was panic and not only with myself, it was panic with my partners and thousands of other people that were in real estate."

the nature of that advantage is nowhere explained in the record.

When all is said and done, it would appear that the sole incentive for the father's participation in the subject transaction was to enable his son to enjoy the benefits of ownership on affordable and/or otherwise favorable terms. Whether the specific reason for the father's participation was to provide his son with the cash component of the purchase price or, for tax reasons, to place legal title to what were in reality the beneficial assets of the son's corporation in the name of another, or simply to facilitate an arrangement by which the purchase price would be kept low by avoiding payment of the plaintiff's commission, is not ultimately of consequence. What is, is that on the record before us it is overwhelmingly shown that, the form of the transaction notwithstanding, its wholly intended effect was to transfer all of the benefits and virtually all of the responsibilities[7] of ownership to the son and his corporation. In these circumstances, where the son and his corporation were, and must in fact have been contemporaneously viewed as the de facto purchasers of the premises,[8] and where all the contacts and transactions incident to the sale—even those brought about by Stein—were effected through the son, it would seem clear that plaintiff earned the commission to which it was entitled under the brokerage contract when, within the term of its exclusive right to sell and with the express permission of the defendant, it contacted the son and made a detailed "submission", the purpose of which was to induce the son's purchase of the property. And, although given the terms of plaintiff's exclusive, it was not necessary for plaintiff to bring about the ultimate "meeting of minds", it may be noted that plaintiff, in its discussions with Okazaki, identified and addressed the precise consideration which ultimately motivated the purchase, namely, that the obligations entailed by ownership would be less costly to the restaurant corporation than those entailed by continuing to lease the premises from which the corporate business was conducted.

---

7. In this connection it may be observed that it is highly unlikely that either the seller or the first mortgage holder would have extended, on the strength of the obligor's credit alone, in the aggregate, nearly two million dollars in loans to an octogenarian retiree whose net worth subsequent to the transaction would amount, at most, to $600,000. It can only have been because all concerned understood that, as proved to be the case, it would be Okazaki America that undertook the actual responsibility for payment of the obligations, that the loans were made.

8. *See, supra,* n 7.

Finally, although there may be concern that a reversal would involve unwarranted appellate disturbance of the trial court's factual findings, findings to which deference is ordinarily accorded, the concern is in this case misplaced. The determination here reviewed was made by the court after a nonjury trial, upon a factual foundation which was in most relevant respects undisputed and did not, in any essential aspect, involve credibility findings incompatible with a contrary result. To differ, then, with the trial court as to the appropriate outcome, necessitates no intrusion upon its primary fact-finding function, much less one in which this Court would substitute its judgment for that of the trial court in matters of credibility, a sphere in which it is generally conceded that the trier of fact, having seen and heard the testimony, has an evaluative advantage worthy of deference. No comparable evaluative advantage nor basis for deference may be perceived where, as here, the focus of judicial scrutiny is not upon the validity of the basic factual findings but upon the soundness of the ultimate inferences made from that factual fundament. At bar, there is no dispute that plaintiff "submitted" the property to Takeshi Okazaki within the term of plaintiff's exclusive right of sale. And, the evidence showing that the transaction was conducted entirely through Takeshi Okazaki and essentially for his corporation's benefit, i.e., to confer upon the corporation the benefits of ownership, was overwhelming and uncontradicted; nowhere in the record is there any evidence supportive of the notion that Hirokichi Okazaki had some independent interest or motive for participating in the transaction. On this record, permitting no other rational inference but that Takeshi Okazaki and Okazaki America were the actual purchasers, overturning the contrary dispositive finding of the trial court would hardly constitute an improvident exercise of this Court's undoubted power, pursuant to CPLR 5501 (c), to render "the judgment which, upon the evidence should have been granted by the trial court" (*De Mayo v Yates Realty Corp.*, 35 AD2d 700, 701; *see generally*, 7 Weinstein-Korn-Miller, NY Civ Prac ¶ 5501.20, and cases cited therein). It should be stressed that in the final analysis the issue in this case was not necessarily whether there was something "underhanded" or "sinister" about the father's participation in the transaction, nor was it necessarily whether his participation was part of a scheme to bilk the plaintiff of its commission; obviously, the defendant need not have committed a tort for the plaintiff to recover pursuant to its contract. Even if the motives and indeed actions of

father, son and seller were innocent, as they may well have been, the fact remains that the son and his corporation were clearly shown to have been the purchasers in fact of the subject premises. That critical and unassailably established fact in conjunction with plaintiff's undisputed satisfaction of the other contractual prerequisites to payment, suffices to establish plaintiff's right under the brokerage contract to a commission.

Accordingly, the judgment of the Supreme Court, New York County (Walter Schackman, J.), entered August 10, 1994, after a nonjury trial, dismissing the complaint, should be reversed and judgment entered entitling plaintiff to recover the commission due under the brokerage contract.

NARDELLI and WILLIAMS, JJ., concur with WALLACH, J.; MURPHY, P. J., and ROSS, J., dissent in a separate opinion by MURPHY, P. J.

Judgment, Supreme Court, New York County, entered August 10, 1994, affirmed, without costs.