OPINION OF THE COURT
Fuchsberg, J.
This appeal by the defendant Maynard Heilman comes to us in the context of a claim by plaintiff Alfred K. Greene, a real estate broker, who asserts he was wrongfully deprived of commissions due him on the sale of a shopping center owned by Heilman to I. Gordon Realty Corporation. Greene had been invited to procure a buyer for-the property by the defendant Richard E. Driscoll. A central issue is the applicability of the agency doctrine of apparent authority in determining whether the codefendant Driscoll’s arrangement with Greene was binding on Heilman. Disputed too is whether Greene was the procuring cause of the ultimate sale, consummated as it was directly between the buyer and seller about a year after Greene had informed Gordon that the property was for sale.
In all, the plaintiff named five defendants. Other than Heilman and Driscoll, these included two corporations and one other individual. The corporate defendants, Todd Mart, Inc. (Todd), and West Wayne Shopping Plaza, Inc. (Plaza), formerly owned the center. Heilman’s other codefendant, one Morris Diamond, like Driscoll, had served with Heilman as an officer of these and other real estate management, ownership or construction corporations.
The complaint contained three causes of action. The first, against all the defendants for breach of contract, asserted, inter alia, that mainly Driscoll and later, to a lesser extent, Diamond, each acting as an individual and as a "principal” of the two corporations, had made the arrangements to hire Greene to procure a buyer for the center and that, in doing so, they had falsely represented that Todd was its owner.[1] Incor *201 porating these allegations by reference, the second count sounded in fraud against Driscoll and Diamond alone, while the third rested on the theory that all the defendants had joined in a civil conspiracy to deprive the plaintiff of his commissions. In a nutshell, Heilman’s defense, aside from its general denial of the conspiracy claim, was that Driscoll had lacked authority, actual or apparent, to contract with Greene on behalf of Heilman and that, in any event, the former was not the procuring cause of the sale to Gordon.
After a nonjury trial, the trial court, largely on the conclusory rationalization that the "corporate connections” between Driscoll and Heilman "were sufficient to cloak Driscoll with the apparent authority not only to manage but to sell such properties as the corporations * * * formerly own[ed]”, handed down a decision solely against Heilman and on the contract cause of action alone. Doing so, the Judge stressed the fact that, in the written offer which immediately preceded the eventual contract to sell, the purchaser recited that he had "received a statement covering West Wayne Plaza from Alfred K. Greene”.* [2] Reasoning that, since the plaintiff was thus "made whole by the judgment on the first cause of action no damage has ensued as a result of the alleged conspiracy [or fraud]”, the court then proceeded to dismiss the remaining counts against all those named.[3]
Affirming the judgment entered on this decision, the Appellate Division, over a dissent by Justice Cardamone, took the position that the cited language in the purchase offer placed a burden on the defendant, presumably at his peril, "to check *202 with the purchaser and settle with him the matter of his potential claim before accepting the offer”. It also found sufficient evidence in the record to support a finding "that the plaintiff was the procuring cause of the sale”. For his part, the dissenter, who would have reversed and directed that all three causes of action be retried, after noting that the trial court had not found that either Driscoll or Diamond had actual authority to deal with Greene on Heilman’s behalf, concluded that, as a matter of law, the alternative of apparent authority had not been established. He also disagreed with the consequences attributed by his colleagues to the purchase offer language. Since we do not find fault with either of these positions, we believe the order affirming the judgment should be reversed. Our analysis follows:
We begin with a more detailed recitation of the controlling facts, many undisputed. The initial communication relevant to the case was a conversation between Driscoll and Greene in October, 1974, during which the former indicated that he was interested in obtaining a buyer for the shopping center and certain other properties as a package. In response to Greene’s routine request for income and expense information, Driscoll immediately followed up by sending him existing operating statements prepared in the course of the management of the properties. Soon thereafter, Greene told Robert Gordon, who throughout acted for the Gordon corporation, that the center was on the market and furnished him with a photocopy of the statement. Greene admits that then and at all pertinent times thereafter he acted on the assumption that Todd, and not Heilman, owned the property and that Driscoll was acting for it. This despite the fact that Heilman’s ownership was a matter of public record, he having bought the property at a Sheriff’s sale some months earlier. It is agreed too that Driscoll never expressly did or said anything from which Greene could gather that Driscoll was acting for Heilman. Consistently, when Greene eventually elected to make a claim, he did so not by sending a bill to Heilman, but to Todd.
Perhaps most remarkably, the record is barren of even a hint that Heilman, whom a family health problem kept away from New York during most of the intervening months until the spring of 1975, was aware of Driscoll’s dealings with Greene, much less that he authorized them. Certainly, whatever motivated Driscoll to act on his own, whether it was a desire to make his marketing of the corporate properties more *203 attractive by coupling them with this one, or whether it was a presumptuous assumption that Heilman would accept a fait accompli, or for whatever other reason best known to himself, none of these were ever shown to be acts, or even motivations, of Heilman.
These facts in mind, taking the proof most favorably to Greene, as we must in the posture of the affirmed findings on which this appeal comes to us, we observe that both Greene and Gordon testified that, although Gordon appeared "interested” in the property, he was not then ready to seriously consider buying it. Imminent bankruptcy of W. T. Grant, the now defunct chain store which was the property’s major tenant, and, to quote Gordon directly, "a number of other things we were doing at that time” kept him from even soliciting an asking price or making an offer. This attitude must have continued for at least a half year, because, whatever his inchoate "interest” amounted to, the unchallenged fact is that he never met, asked to meet or was invited to meet with anyone purporting to represent the owner of the property, and concededly not with Heilman. Neither, during all this time, did Greene ever show or offer to show him through the property,[4] nor, significantly, at trial, could Gordon recollect that a second meeting or telephone call with Greene had ensued during the balance of that year.
We now shift our attention to the spring of 1975. Heilman, having just returned to New York, was faced with demands that the total of a large bank loan on which he was an obligor be reduced. While reviewing the possibility of liquidating some of his holdings with Joseph La Manna, his accountant, he was advised by La Manna that another one of his firm’s clients, I. Gordon Realty, had recently come into a large sum of money it was looking to invest. Following up on this independent recommendation, Heilman asked to meet with Gordon. It was this meeting from which there eventuated negotiations which were consummated by the sale of the center in the fall of 1975, by which time approximately a year had gone by since Greene’s unfruitful conversation with Gordon.
In sum, a fine-tooth-combing of the record discloses no proof that Heilman delegated power to choose Greene or any other *204 broker to negotiate the sale of his property. There is no indication of any direct grant of such authority to Driscoll or, for that matter, to Diamond. Nor was Heilman responsible for any manifestations which, though indirect, would support a reasonable inference of an intent to confer such authority (see Restatement, Agency 2d, § 7, Comment c). Certainly, that Heilman, Driscoll and Diamond in common held stock, directorships or officerships in several corporations, whatever the powers they thus possessed with respect to the corporations’ affairs, did not, without more, give rise to any power to act with respect to each other’s personal property. In particular, mere authority to manage Heilman’s personal realty would not include authority to take steps to sell it (see Restatement, Agency 2d, § 52, Comment c). And, of course, Greene’s unsupported surmise — that Driscoll would not have contracted with Greene if he had not been commissioned to do so — but begs the question.
We turn then to the subject of apparent or, as it is sometimes called, ostensible authority, essentially the legal wellspring from which, absent actual authority, Trial Term and the majority at the Appellate Division thought Greene drew the right to hold Heilman for the acts of Driscoll. Apparent authority may exist in the absence of authority in fact, and, if established, may bind one to a third party with whom the purported agent had contracted even if, as in the present case, the third party is unable to carry the burden of proving that the agent actually had authority.
As with implied actual authority, apparent authority is dependent on verbal or other acts by . a principal which reasonably give an appearance of authority to conduct the transaction, except that, in the case of implied actual authority, these must be brought home to the agent while, in the apparent authority situation, it is the third party who must be aware of them (Ford v Unity Hosp., 32 NY2d 464, 473; Stanton v Hawley, 193 App Div 559, 560; see Restatement, Agency 2d, § 8, Comments a, c). Key to the creation of apparent authority is that the third person, accepting the appearance of authority as true, has relied upon it (Restatement, Agency 2d, § 27, and Comment a). As demonstrated in the case before us now, these criteria just were not met.
So also, the consequent failure to establish apparent authority was not offset by the lack of exception by Heilman to Gordon’s insertion of Greene’s name in the purchase offer. *205 The first sentence in its brokerage clause merely acknowledged that Greene had provided Gordon with "a statement” covering the premises. It in no way declared that a commission was due on that account or that Greene had been the procuring cause. Instead, it carefully avoided the familiar boilerplate used to indicate which broker, if any, brought about the sale (see, e.g., Williston, Contracts [3d ed, 1 Forms], § 922, at p 184). So, in the clause’s second and only other sentence, the purchaser did no more than assure itself, as sophisticated purchasers usually do, that the obligation for "any” brokerage commission on the sale was to be the seller’s and not the buyer’s. Fairly read, this language manifested no intention to create a third-party beneficiary (see 2 Williston, Contracts [3d ed], § 356A; cf. Ficor, Inc. v National Kinney Corp., 67 AD2d 659).
The record here also lends no support to the charge that Heilman was a participant in the conspiracy charged by the third cause of action. There was nothing to show that he played any párt in Driscoll’s and Diamond’s alleged misrepresentations as to the ownership, the gravamen of the fraud pleaded in the second cause of action, which, in turn, specifically ascribed the fraud to Driscoll and Diamond only. Therefore, had the third cause of action not been dismissed by the trial court solely because it had decided to award damages on the first one, as to Heilman the third would have had to go by the board because no prima facie case had been made out.
For all these reasons, we conclude that no actual or apparent authority in Driscoll or Diamond to enter into the agreement has been established.
The trial court’s rationale for dismissal of the second and third causes of action against Driscoll and Diamond having thus been swept aside, we now give our attention to the procuring cause issue. For, to put it broadly, if it cannot be said that Greene brought about the sale, he at all odds would not be entitled to compensation. The remaining claims then bespeaking instances of damnum absque injuria, they too would have to fall.
It has long been recognized that a broker, save when he enjoys the benefit of a special agreement to the contrary, does not automatically and without more make out a case for commissions simply because he initially called the property to the attention of the ultimate purchaser (see Newberry & Co. v Warnecke & Co., 267 App Div 418, 421, affd 293 NY 698; *206 Munson v Tilley, 45 AD2d 806, 807). If that were enough, given the enterprise which our competitive society prizes in its brokers and its salesmen, a veritable morass of claims to proprietary rights in their prospects would result.
That is not to say that, in order to qualify for a commission, the broker in all instances must have been the dominant force in the conduct of the ensuing negotiations or in the completion of the sale. But, however variable the judicial terminology employed to express the requirement that the broker must be the procuring cause,[5] it has long been recognized that there must be a direct and proximate link, as distinguished from one that is indirect and remote, between the bare introduction and the consummation (see Lord v United States Transp. Co., 143 App Div 437, 454-455).
Sibbald v Bethlehem Iron Co. (83 NY 378), our seminal case on this point, articulating the prevailing rule (e.g., Lipe v Ludewick, 14 Ill App 372; Nielson’s Case, 236 Mass 1; Armstrong v Wann, 29 Minn 126; Earp v Cummings, 54 Pa 394), has made that clear. In Sibbald, after repeated efforts by the plaintiff to solicit an offer from his customer over a period of four months had been to no avail, negotiations initiated by the purchaser on its own led to a sale through another broker. The court held he was not the procuring cause of the sale because he had not brought together the "minds of the buyer and seller”. (Sibbald v Bethlehem Iron Co., supra, at p 382; see, also, Byrne, Bowman & Forshay v 488 Madison Ave., 11 Misc 2d 587, 590, affd 286 App Div 826 [broker who initiated negotiations for a lease of realty, eventually closed by another broker, never "discussed any of the basic and material details upon which the parties would reasonably have had to agree before a lease could be executed”].)
The facts in the case before us fall foursquare within the spirit of these cases. In essence, the most that can be said for Greene’s efforts is that he alerted Gordon to the availability of the property. Although he testified that, after his initial conversations with Gordon and Driscoll, he had spoken again to each of them on some other unrecorded and undated occasions, he did not claim that he had obtained a figure from either of them even then. He never arranged nor attempted to arrange for a meeting of these persons, much less of their *207 minds. He never showed Gordon the property. He did nothing to excite a practical interest in negotiating, even by exploring, on his own or with the parties, such obvious questions as the ability of Gordon to make the purchase, whether there was a cure for a tax problem the record shows then confronted the property, or the effect of the expected commercial demise of the Grant tenancy. There was not even the slightest prodding towards any meeting of the minds from October, 1974 until the time six months later when Heilman and Gordon, prompted by each one’s then current financial picture and the happenstance that each was a client of La Manna’s accounting firm, independently and directly, and without any aid or intervention by Greene, on their own entered upon meetings, discussions and negotiations, things Greene never even suggested.
Over and above this, Greene’s indifference and inactivity, an attitude presumably conditioned by Gordon’s passivity, extended far beyond the months preceding the direct Hellman-Gordon dealings. As detailed previously, it also prevailed for the four or five months that elapsed from the time the negotiations between the principals got underway in the late spring of 1975 until the closing in September of that year. During all the latter period, Greene, if he knew the property was being sold, made no claim to any continuing interest and, if, perchance, he did not know, he did not so much as lift a finger to do anything towards a sale of the property, not even to the extent of proposing a single other prospect. In all, the entire picture smacks almost irrefutably of abandonment (see Sampson v Ottinger, 93 App Div 226).
Under these circumstances, even if it be said that Greene had "introduced to each other parties who otherwise would have never met” or had "created impressions which, under later and more favorable circumstances, naturally [led] to and materially [assisted] in the consummation of a sale”, a picture far more favorable to the plaintiff than the one we face here, as a matter of law his claim for commissions would have had to be dismissed (Sibbald v Bethlehem Steel Co., 83 NY 378, 383, supra). A fortiori, we so conclude here.
For all these reasons, the order of the Appellate Division should be reversed and the complaint dismissed, with costs.

. As Heilman’s brief points up, the first cause of action does not appear to be directed against Heilman per se. Specifically, nowhere is it alleged in so many words that Heilman contracted with Greene or that Driscoll or Diamond did so other than for the corporations and themselves. Nevertheless, in the contract count, the plaintiff did state specifically that he had made a demand for commissions against all the defendants, which included Heilman by name. Further, the charge that Heilman was involved in the transaction was explicit in both the second and third causes of action. *201 Moreover, no suprise is or was claimed either at nisi prius or at the Appellate Division, and the issue passed upon in those courts, even if the pleading left the matter obscure, was fully litigated there on its merits. True, appellant’s protestations are hardly hypertechnical. And the pleading imperfections to which they are directed are not to be encouraged. Yet, the question having been raised at the Appellate Division, in light of our ever-increasing concern for substance over form, we do not disturb the exercise of discretion implicit in that court’s condonation of this irregularity (Dampskibsselskabet Torm A/S v Thomas Paper Co., 26 AD2d 347; see Diemer v Diemer, 8 NY2d 206, 212).

. This statement preceded the following sentence: "It is understood and agreed that any broker’s commission due on the transfer of this property shall be the obligation of the seller, and the [buyer] shall not be obligated for a broker’s commission if this transaction shall fail to close for any reason whatsoever or under any other circumstances”. The two quoted sentences are the only ones on this or any related subject.

. We note that, conceptually at least, unless and until the judgment were paid, this would not follow (1 NY Jur 2d, Actions, § 14).

. Gordon testified that, apparently unbeknownst to either Greene or anybody connected with the center, he had visited stores located there on several occasions. However, none of these visits stimulated him to communicate with Greene, Driscoll or anyone else.

. E.g., "efficient cause of the sale” (Sussdorff v Schmidt, 55 NY 319, 321); "predominating efficient cause” and "really effective means” (Myers v Batcheller, 177 App Div 47, 51).