OPINION OF THE COURT
Acosta, J.
In this appeal, we must determine whether plaintiff broker has alleged facts sufficient to establish its entitlement to a commission on the sale of real estate, where it expended significant effort locating an apartment for buyers who abandoned the transaction and purchased another apartment in the same building 18 months later. In addition, we take this opportunity to clarify the standard by which a broker may be found to have been the “procuring cause” of a real estate transaction. We find that the complaint sufficiently alleges that plaintiff was a direct and proximate link between the introduction of defendant buyers and the seller and the consummation of the transaction to withstand defendants’ motion to dismiss.
The following facts are taken from the complaint. As we are called upon to decide a motion to dismiss, we accept the allegations in the complaint as true and draw all reasonable *96 inferences in plaintiffs favor (Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998]). Plaintiff, SPRE Realty, Ltd. (SPRE), is a licensed New York State real estate broker that does business under the name Susan Penzner Real Estate. In early 2006, defendants, Daniel and Jill Dienst, retained SPRE as their real estate broker to help them purchase a luxury residence in Manhattan. Although their agreement was not reduced to writing, the parties had an understanding that SPRE would receive a commission after securing a residence that met defendants’ expectations. Susan Penzner, the founder and principal of SPRE, spearheaded SPRE’s efforts to locate a suitable property.
SPRE showed defendants several residences in Manhattan over the first 18 months of the parties’ relationship. In or around October 2007, Penzner introduced defendants to a condominium development at 397 West 12th Street (397 West), which was under construction. After defendants expressed an interest in 397 West, Penzner brought them to the office of the developer (Far West Village Partners) to view the “layout and renderings” of the building, and to the private home of a principal of the developer to view an example of the developer’s work. Defendants “fell in love with the [p]roperty” and thought the developer’s principal “seem[ed] like a great guy.”
SPRE negotiated with the developer on defendants’ behalf concerning the total cost of a duplex condominium at 397 West, a post-purchase discount in the event of a subsequent sale of a similar unit at 397 West for a lower price, and specific design elements that defendants requested. Based on these negotiations, SPRE sent a deal sheet to the developer around July 1, 2008, anticipating defendants’ purchase of two units at 397 West for $11.5 million. About a week later, attorneys for defendants and the developer exchanged and reviewed a contract of sale for the two units. According to SPRE, the contract contained the same material terms as the deal sheet that SPRE prepared.
Meanwhile, Penzner searched for architects who would be capable of executing defendants’ specific design plans. She reached out to several prospects and ultimately recommended and introduced John Pawson, an internationally renowned architect, to defendants. In late July 2008, Penzner arranged for and attended a meeting with one of the developer’s principals at defendants’ summer home in Sag Harbor, New York. SPRE characterized that meeting as “successful.”
Despite SPRE’s efforts, in late August 2008 defendants “pulled out of the deal, stating that they had changed their *97 mind[s] and were no longer in the market for a new home.” Penzner emailed Mr. Dienst a few months later to inquire whether defendants had any renewed interest in purchasing a home, but she received no response. During that time, Penzner continued “in good faith” to assist Mrs. Dienst in a search for a commercial property for her art and antiques store. Mrs. Dienst repeatedly confirmed that she and her husband were no longer seeking to purchase a residence and that they had no lingering interest in 397 West.
Nonetheless, in February 2010, defendants purchased a duplex condominium at 397 West comprised of a different pair of units than the ones they had previously sought to purchase. SPRE alleges that defendants deliberately concealed their intention to purchase property at 397 West in order to avoid paying SPRE a broker’s commission.
SPRE commenced this action in May 2013, alleging breach of implied contract and unjust enrichment. Defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7), arguing that SPRE could not prove that it was the procuring cause of the real estate transaction or that it was entitled to a commission for services rendered. In an affidavit supporting the motion, Mr. Dienst stated, inter alia, that he and his wife never signed the deal sheet or contract of sale for the first duplex, that they ultimately purchased a different duplex at 397 West for $6.5 million, and that SPRE was not involved in the purchase of the second duplex.
The motion court denied the motion to dismiss, noting that defendants might have returned to 397 West on a “periodic basis” during the 18-month period between the abandonment of the first transaction and defendants’ ultimate purchase, which would evince a bad-faith termination of the original transaction. This appeal followed, and we now affirm.
Discussion
“[I]n the absence of an agreement to the contrary, a real estate broker will be deemed to have earned his commission when he [or she] produces a buyer who is ready, willing and able to purchase at the terms set by the seller” (Lane—Real Estate Dept. Store v Lawlet Corp., 28 NY2d 36, 42 [1971]). A broker does not earn a commission merely by calling the property to the attention of the buyer (Greene v Heilman, 51 NY2d 197, 205 [1980]). But this does not mean that the broker “must have been the dominant force in the conduct of the ensuing negotiations or in the completion of the sale” (id. at 206). Rather, *98 the broker must be the “procuring cause” of the transaction, meaning that “there must be a direct and proximate link, as distinguished from one that is indirect and remote,” between the introduction by the broker and the consummation of the transaction {id.).
The departments of the Appellate Division, this Court being no exception, have applied varying language in elaborating on that standard. For example, the three other departments have stated that “if a broker ‘does not participate in the negotiations, he must at least show that he created an amicable atmosphere in which negotiations went forward or that he generated a chain of circumstances which proximately led to the sale’ ” (Cappuccilli v Krupp Equity Ltd. Partnership, 269 AD2d 822, 823 [4th Dept 2000], quoting Briggs v Rector, 88 AD2d 778, 779 [4th Dept 1982]; Talk of the Town Realty v Geneve, 109 AD3d 981, 982 [2d Dept 2013]; Spalt v Lager Assoc., 177 AD2d 879, 882 [3d Dept 1991]).[1]
Although this department has cited, and even quoted from, cases that have used the phrase “amicable atmosphere,” we have not gone so far as to adopt that specific standard. However, this Court has suggested that a broker can be the procuring cause if he or she “brought ‘the parties together in an amicable frame of mind, with an attitude toward each other and toward the transaction in hand which permits their working out the terms of their agreement’ ” (Aegis Prop. Servs. Corp. v Hotel Empire Corp., 106 AD2d 66, 72-73 [1st Dept 1985], quoting Salzano v Pellillo, 4 AD2d 789, 790 [2d Dept 1957]).[2] The use of the language in Aegis appears to be an aberration in this department, though, because we have more frequently and recently applied the “direct and proximate link” test (see e.g. Joseph P. Day Realty Corp. v Chera, 308 AD2d 148, 154 [1st Dept 2003]).
The Court of Appeals has not sanctioned the “amicable atmosphere” or “amicable frame of mind” language. It has, however, affirmed without opinion a finding that a broker was the procuring cause where it “generated a chain of circumstances which proximately led to” a lease transaction (Eugene J. Busher Co. v Galbreath-Ruffin Realty Co., 22 AD2d 879, 879 [1st Dept 1964], affd 15 NY2d 992 [1965]). In any event, the Court has stated *99 that “however variable the judicial terminology employed to express the requirement that the broker must be the procuring cause, it has long been recognized that there must be a direct and proximate link, as distinguished from one that is indirect and remote, between the bare introduction and the consummation” (Greene, 51 NY2d at 206 [footnote omitted]).
We regard the “amicable atmosphere” and “amicable frame of mind” standards as somewhat broader and more amorphous than the requirement of a “direct and proximate link,” or even a requirement that the broker “generated a chain of circumstances which proximately led” to a transaction’s consummation. Although courts have attempted to harmonize the continued use of the “amicable” phrases discussed above with Court of Appeals precedent articulating the “direct and proximate link” standard, the former phrases are not precise enough terms by which to determine whether a broker is the procuring cause of a transaction.[3] Reliance on the creation of an “amicable atmosphere in which negotiations went forward” seems to ignore the proximity element of the “direct and proximate link” test. Furthermore, we think that this continued deviation from the standard set forth by the Court of Appeals in Greene has led to some confusion. Yet litigants, and the bar, deserve a greater level of certainty.
Therefore, in order to reduce the confusion that has arisen from the more nebulous terminology heretofore employed by the departments of the Appellate Division, we reiterate that the “direct and proximate link” standard articulated in Greene governs determinations of circumstances under which a broker constitutes a procuring cause within the First Department. This standard requires something beyond a broker’s mere creation of an “amicable atmosphere” or an “amicable frame of mind” that might have led to the ultimate transaction. At the same time, a broker need not negotiate the transaction’s final terms or be present at the closing (Sholom & Zuckerbrot Realty Corp. v Citibank, 205 AD2d 336, 338-339 [1st Dept 1994]).
In the present case, even under the more exacting “direct and proximate link” standard, we find that the allegations in the complaint sufficiently state that SPRE was the procuring cause of defendants’ purchase of the second duplex at 397 West. *100 SPRE brought defendants to the building on several occasions; introduced defendants to the developer and attended several meetings between the developer and defendants; reviewed floor plans with defendants; negotiated favorable terms for defendants on the original units; prepared a deal sheet with defendants’ preliminary offer terms on the first duplex for the developer’s consideration; drafted a contract of sale; and connected defendants with a reputable architect whom SPRE specially selected to implement defendants’ design plans. Affording these allegations a liberal construction, we find that they establish that SPRE’s actions and efforts may have been a direct and proximate link between the introduction of defendants to the developer and defendants’ purchase of the second duplex at 397 West. Whether SPRE was the procuring cause “is a question of fact to be decided on the evidence” (Gregory v Universal Certificate Group LLC, 32 AD3d 777, 778 [1st Dept 2006]).
Even if SPRE is unable to prove that it was the procuring cause of defendants’ purchase, it may be able to prove that defendants terminated its activities “ ‘in bad faith and as a mere device to escape the payment of the commission’ ” (see Di Stefano v Rosetti-Falvey Real Estate, 270 AD2d 631, 632 [3d Dept 2000]; Sibbald v Bethlehem Iron Co., 83 NY 378, 384 [1881]; Winick Realty Group LLC v Austin & Assoc., 51 AD3d 408 [1st Dept 2008]; Williams Real Estate Co. v Viking Penguin, 228 AD2d 233, 233 [1st Dept 1996]). Although 18 months passed between the abandonment of the first transaction and the conclusion of the second transaction, whether defendants withdrew from the first transaction in good faith is a question of fact to be decided on the evidence. The answer will depend on when defendants renewed their interest in 397 West and recommenced negotiations with the developer of the property. As the motion court noted, it is possible that defendants never lost interest in 397 West but returned to it on a “periodic basis,” which would evince an intent to terminate the first transaction and exclude SPRE from the second transaction to avoid paying a commission. Clearly, at this early juncture in the litigation, we cannot definitively conclude whether defendants abandoned the first duplex negotiation in good faith.
Nor can we conclude that the completed transaction was fundamentally different from the abandoned transaction (see Garrick-Aug Assoc. Store Leasing v Hirschfeld Realty Club Corp., 3 AD3d 406 [1st Dept 2004]). While the price that *101 defendants ultimately paid — according to Mr. Dienst’s affidavit — was less than half the price that they would have paid for the first duplex, plaintiff alleges that the two units they ultimately purchased were “substantially identical” to the units that SPRE had procured for them. Additionally, as SPRE points out, it was during the 18-month interval between the abandoned transaction and the consummated transaction that the economic downturn occurred, so the price of the allegedly similar units may have dropped precipitously during that time or defendants may have been able to negotiate a lower price.
Whether SPRE can be deemed to have earned a commission on the abandoned transaction is also a question of fact to be decided on the evidence. A broker may be entitled to a commission where the buyer authorizes the broker to submit an offer to the seller but subsequently fails to execute or arbitrarily refuses to enter into a contract of sale (Duross Co. v Evans, 22 AD2d 573 [1st Dept 1965]; Pease & Elliman, Inc. v Gladwin Realty Co., Inc., 216 App Div 421 [1st Dept 1926]; Westhill Exports v Pope, 12 NY2d 491 [1963]). Moreover, a signed contract of sale is unnecessary to hold defendants liable for the commission on the abandoned transaction, if SPRE can prove that it had an implied contract with defendants, that a contract of sale was prepared on terms that SPRE was authorized by defendants to offer, and that defendants’ refusal to sign the contract of sale was arbitrary (see Duross Co., 22 AD2d at 573-574; Westhill Exports, 12 NY2d at 497). Defendants argue that SPRE failed to allege that it was authorized by them to submit an offer to the seller, but if it has or obtains evidence of such authorization, SPRE may amend the complaint to conform to the proof (CPLR 3025 [c]). Defendants’ contention that SPRE was not so authorized is also a question of fact that should await discovery.
Finally, inasmuch as the allegations in the complaint state a cause of action not for unjust enrichment but for quantum meruit (see Edward S. Gordon Co. v Peninsula N.Y. Partnership, 245 AD2d 189, 190 [1st Dept 1997]), we note that a motion to dismiss “must be denied if from the pleadings’ four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law” (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 152 [2002] [internal quotation marks omitted]).
Accordingly, the order of Supreme Court, New York County (Charles E. Ramos, J.), entered October 1, 2013, which denied *102 defendants’ motion to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7), should be affirmed, with costs.
Andrias, Saxe, Freedman and Feinman, JJ., concur.
Order of Supreme Court, New York County, entered October 1, 2013, affirmed, with costs.

. It appears that the “amicable atmosphere” language originated in the Fourth Department (see Briggs, 88 AD2d at 779).

. The “amicable frame of mind” language appears to have originated in Supreme Court, New York County (see Baird v Krancer, 138 Misc 360, 362 [Sup Ct, NY County 1930]).

. The phrase “direct and proximate,” as used in the context of a real estate broker’s action to recover commissions, was apparently first employed by this department in 1911 (see Greene, 51 NY2d at 206, citing Lord v United States Transp. Co., 143 App Div 437, 454-455 [1st Dept 1911]).