Saunders Ventures, Inc. v Catcove Group, Inc. (2022 NY Slip Op 05879)

Saunders Ventures, Inc. v Catcove Group, Inc.

2022 NY Slip Op 05879

Decided on October 19, 2022

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 19, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ANGELA G. IANNACCI, J.P.
SHERI S. ROMAN
PAUL WOOTEN
JOSEPH A. ZAYAS, JJ.

2019-12178
 (Index No. 37906/11)

[*1]Saunders Ventures, Inc., etc., appellant, 
v
Catcove Group, Inc., et al., respondents.

Conforti & Waller, LLP, Southampton, NY (Anthony T. Conforti and Kenneth Cooperstein of counsel), for appellant.
MargolinBesunder, LLP, Islandia, NY (Jeffrey D. Powell and Harvey B. Besunder of counsel), for respondents.

DECISION & ORDER
In an action to recover a real estate brokerage commission, the plaintiff appeals from a judgment of the Supreme Court, Suffolk County (Jerry Garguilo, J.), entered August 9, 2019. The judgment, upon a decision of the same court dated March 18, 2019, made after a nonjury trial, is in favor of the defendants and against the plaintiff, in effect, dismissing the first cause of action.
ORDERED that the judgment is reversed, on the facts, with costs, the first cause of action is reinstated, and the matter is remitted to the Supreme Court, Suffolk County, for the entry of an appropriate amended judgment in favor of the plaintiff and against the defendants on that cause of action.
The plaintiff, a real estate brokerage firm, challenges a judgment rendered in favor of the defendants after a nonjury trial on the first cause of action, which sought to recover damages for breach of contract from the defendants upon the sale of the defendants' real property. The following evidence was presented at trial.
The defendant entities, both solely owned by Beatrice Gotthelf, owned certain environmentally sensitive properties located in Suffolk County (hereinafter the subject properties). The subject properties were on a "master list" maintained by the County of properties identified for preservation. As is done for all properties on its "master list," the County sent a letter dated March 20, 2008, to one of the defendant entities, inquiring whether it was interested in participating in the County's Land Preservation Program and advising, in that event, that the next step would be for the County to obtain an appraisal to enable it to make an offer. Although Gotthelf indicated her interest in a possible sale to the County, there is no evidence that any appraisal was done or any other steps were taken by the County or Gotthelf at that time.
More than one year later, in July 2009, Lee Minetree, a real estate broker employed by the plaintiff, entered into a nonexclusive brokerage agreement with Gotthelf to market the subject properties in exchange for a 6% commission. Upon his engagement, Minetree approached Randall Parsons, an employee of the Nature Conservancy of Long Island (hereinafter TNC), regarding any interest that entity might have in the subject properties. Parsons suggested a "bargain sale" to the [*2]County through TNC, a tax exempt organization (see Internal Revenue Code [26 USC] § 501[c][3]), which would involve the defendants accepting less than fair market value and claiming the difference between the fair market value and the bargain price as a tax deductible charitable contribution. At Parsons's request, and in consultation with Minetree, Gotthelf prepared and sent to Parsons a letter of interest dated July 20, 2009.
A meeting was thereafter arranged between Parsons, Gotthelf, Minetree, and a representative of the County, and negotiations ensued. The County obtained an appraisal and, in May 2010, offered to purchase the subject properties (8 parcels totaling approximately 20 acres) for $175,000 per acre. A contract of sale between the defendants and TNC, contingent on the County Legislature's approval of the County's purchase of the subject properties from TNC, was drafted but never signed. On September 10, 2010, the defendants' attorney wrote to TNC, advising that the defendants would no longer be working with that entity as a contract vendee and requesting that "the contract . . . be released to Peconic Land Trust," another tax exempt organization, as contract vendee. Eleven days later, the defendants signed the contract with Peconic Land Trust (hereinafter PLT), agreeing to convey it eight parcels contingent on County legislative approval. The contract was later amended to make clear that PLT's obligations were contingent on the County's acquisition of the subject properties and that PLT was not required to close except simultaneously with a closing of its sale to the County. PLT and the County executed their contract in March 2011, and title was subsequently transferred from the defendants to PLT and from PLT to the County. Payment for the subject properties was made directly by the County to the defendants.
Following the sale, the plaintiff sought to collect a commission in the sum of $97,318.20. That amount represented 4% of the gross sales price, as the plaintiff had agreed during the course of the sale negotiations to accept that lesser rate. Upon the defendants' refusal to pay the commission, the plaintiff commenced the present action.
Following motion practice, the Supreme Court awarded summary judgment to the defendants dismissing the complaint. On a prior appeal from an ensuing judgment in favor of the defendants and against the plaintiff dismissing the complaint, this Court modified the judgment by reinstating the first cause of action, alleging breach of contract, finding triable issues of fact, among other things, as to whether the plaintiff was the procuring cause of the sale (see Saunders Ventures, Inc. v Catcove Group, Inc., 151 AD3d 991, 994).
The matter proceeded to a nonjury trial, after which the trial court concluded that "the evidence weigh[ed] so evenly that it [was] unable to say that there was a preponderance on either side." The evidence in favor of the defendants that was emphasized by the trial court was the 2008 letter of interest from the County, which the trial court interpreted as showing that the County was "in the mix" prior to the plaintiff's engagement. As the burden of proof rested with the plaintiff, the trial court ruled in favor of the defendants, and a judgment was entered, in effect, dismissing the first cause of action. The plaintiff appeals.
In reviewing a determination made after a nonjury trial, the power of this Court is as broad as that of the trial court, and this Court may render the judgment it finds warranted by the facts, bearing in mind in a close case that the trial judge had the advantage of seeing the witnesses (see Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499; Castaldi v Syosset Cent. Sch. Dist., 203 AD3d 690).
"To prevail on a cause of action to recover a commission, the broker must establish (1) that it is duly licensed, (2) that it had a contract, express or implied, with the party to be charged with paying the commission, and (3) that it was the procuring cause of the sale" (Douglas Elliman, LLC v Silver, 136 AD3d 658, 659; see Saunders Ventures, Inc. v Catcove Group, Inc., 151 AD3d at 994). Here, the issue disputed by the parties was whether the plaintiff was the procuring cause of the sale. "To establish that a broker was the procuring cause of a transaction, the broker must establish that there was 'a direct and proximate link, as distinguished from one that is indirect and remote'" between the bare introduction of the parties to the transaction and the consummation of the sale (Douglas Elliman, LLC v Silver, 136 AD3d at 659, quoting Greene v Hellman, 51 NY2d 197, [*3]206). "[I]n order to qualify for a commission, a broker need not have been involved in the ensuing negotiations or in the completion of the sale," if such a direct and proximate causal link exists (Hentze-Dor Real Estate, Inc. v D'Allessio, 40 AD3d 813, 816; see Saunders Ventures, Inc. v Catcove Group, Inc., 151 AD3d at 994).
In the present case, we conclude that the evidence established that the plaintiff was the procuring cause of the sale (see Zere Real Estate Servs., Inc. v Parr Gen. Contr. Co., Inc., 102 AD3d 770, 773; Getreu v Plaxall Inc., 261 AD2d 574, 575; Buck v Cimino, 243 AD2d 681). In concluding otherwise, the trial court assigned undue weight to the 2008 letter from the County to one of the defendant entities. This was a form letter sent to all properties on the "master list" and although Gotthelf returned the letter, having checked the box indicating her interest in discussing a possible sale to the County, there is no evidence that either party followed up or took any action whatsoever to explore a potential sale to the County in connection with this letter. It was not until Minetree began to market the subject properties and approached TNC, more than one year later, that any discussions were had with the County.
On the other hand, the trial court gave too little weight to significant evidence the plaintiff submitted in support of its claim to a commission. Although the defendants elicited much testimony in an attempt to minimize Minetree's involvement, such as testimony that Minetree did not have contacts with the County, that Parsons suggested the bargain sale, and that the County, TNC, and PLT were all known to Gotthelf prior to Minetree's involvement, the defendants' evidence was severely undermined by a critical admission. Specifically, Gotthelf admitted that had the sale gone through with TNC as the contract vendee rather than PLT, the plaintiff would have been entitled to a commission. In light of this admission, the only real question is whether the plaintiff could no longer be considered the procuring cause of the sale once TNC was replaced with PLT. We answer that question in the negative.
It was Minetree's introduction of the subject properties to, and work with, TNC which brought the County and the defendants together on a bargain sale transaction. As testified to at trial by the County's representative, "by the time [PLT] entered the picture [the County's] acquisition [ ] of the defendant's property was for the most part a done deal." As the witness confirmed, by that time, all of the appraisals had been prepared and reviewed by the County and an offer had been extended and accepted. Although our dissenting colleague suggests that the terms of the deal were different once PLT became the contract vendee, thus implying that the plaintiff's efforts had not brought the minds of the parties together as to the material terms of the ultimate sale, the only difference specifically identified in the dissent is the number of parcels included in the sale (which affected the total sale price). The trial testimony demonstrated, however, that the deal negotiated with both TNC and PLT as contract vendees was for the sale of eight parcels and that the reduction in the final sale to six parcels had nothing to do with the contract vendee. Instead, the County decided not to purchase certain parcels once the title report came back because the report revealed that those parcels were subject to right-of-way easements. While this resulted in a reduction of the total sale price, the price term remained the same as it was when TNC was the contract vendee, i.e., $175,000 per acre.
Our dissenting colleague also emphasizes that Gotthelf and the principal of PLT had a preexisting personal and professional relationship and that, according to Gotthelf, these parties had discussed a bargain sale before Minetree's involvement. However, despite this relationship and any such discussions, there is no evidence that any effort was made by Gotthelf or PLT to approach the County or otherwise begin to put together a bargain sale. In other words, there is no evidence to suggest that if Minetree had not approached and worked with TNC, a bargain sale with the County would likely have occurred nonetheless.
Indeed, Minetree's role in bringing the defendants and the County together on a bargain sale was even acknowledged by Gotthelf after TNC was no longer involved. Specifically, after the defendants' attorney requested that TNC release the contract to PLT on September 10, 2010, Gotthelf signed County-required disclosure forms on September 14, 2010, and again on October 6, 2010. Both times, she identified Minetree on the forms as a broker entitled to earn a commission. [*4]The defendants' attorney further testified at trial that he sent an email to the plaintiff's attorney in October 2010, after TNC was "out of the mix," indicating that Gotthelf was willing to pay a 3% commission to the plaintiff. While Gotthelf may have shortly thereafter "changed her mind" about her willingness to pay a commission to the plaintiff, her obligation to pay the commission was well established by the trial evidence.
Accordingly, we reverse the judgment, reinstate the first cause of action, and remit the matter to the Supreme Court, Suffolk County, for the entry of an appropriate amended judgment in favor of the plaintiff and against the defendants on that cause of action.
In light of our determination, we need not reach the parties' remaining contentions.
IANNACCI, J.P., WOOTEN and ZAYAS, JJ., concur.
ROMAN, J., dissents, and votes to affirm the judgment, with the following memorandum:
I respectfully disagree with the conclusion reached by my colleagues in the majority to reverse the judgment, and to remit the matter to the Supreme Court, Suffolk County, for the entry of an amended judgment in favor of the plaintiff and against the defendants on the breach of contract cause of action. The plaintiff failed to establish that it was the procuring cause of the sale of certain real property to the Peconic Land Trust, and, ultimately, the County of Suffolk. Accordingly, I dissent.
The plaintiff is a licensed real estate brokerage firm, and the defendants are the former owners of parcels of vacant real property located in the Town of Southampton (hereinafter the subject property), which had been identified by the Peconic Estuary Program as high priority for preservation and protection (see Saunders Ventures, Inc. v Catcove Group, Inc., 151 AD3d 991).
In March 2008, the County sent a letter addressed to the defendant Catcove Group, Inc., which stated that the County had identified a certain parcel of real property owned by Catcove Group, Inc., "as being of interest to our Land Preservation Program." At trial, a representative from the County confirmed that by sending this letter, the County was expressing its interest in purchasing the property.
Beatrice Gotthelf, the sole shareholder of Catcove Group, Inc., and the sole member of the defendant Riverside Catwalk, LLC, personally responded that she was interested in discussing a possible sale of that real property to the County. Subsequently, in July 2009, the plaintiff and the defendants entered into a nonexclusive brokerage agreement concerning the sale of the subject property. The subject property included, among other parcels, the parcel addressed by the County's March 2008 letter. The nonexclusive brokerage agreement contemplated a sale of the subject property for $8 million. Pursuant to the nonexclusive brokerage agreement, Lee Minetree, a broker employed by the plaintiff, provided a list of potential customers for the subject property to Gotthelf. This list included the Nature Conservancy of Long Island (hereinafter TNC), but did not include the County or the Peconic Land Trust (hereinafter PLT). The County and PLT, entities which were known to Gotthelf prior to Minetree's involvement, would later become the parties contractually named in the sale of the subject property.
Minetree marketed the subject property to, among others, TNC. Gotthelf also sent a letter dated July 20, 2009, to Randall Parsons of TNC at Parsons's request. The letter expressed Gotthelf's understanding that TNC and/or the County "may be interested in acquiring [the subject] property," and that Gotthelf was "interested in receiving a fair market value offer from" TNC and/or the County for "some or all of my land."
During these preliminary discussions, Parsons indicated to Minetree that TNC was not interested in purchasing the subject property at a sale price of $8 million, but suggested that the County might be. Notably, since Minetree did not have any contacts with the County, Parsons [*5]assisted in setting up a meeting between Gotthelf, TNC, and the County. Thereafter, in August 2009, Gotthelf, Minetree, Parsons, and a representative from the County attended a meeting concerning the potential sale of the subject property. At some point after the initial meeting, the parties discussed the possibility of selling the subject property to the County via a "bargain sale," with TNC as an intermediary.
Then, by letter dated May 10, 2010, the County made a formal offer to the defendants for the purchase of the subject property. The letter contemplated a sale of 20.1 acres of land at a value of $175,000 per acre, for a full fee value of $3,517,000. The letter also contained a note stating that the County's offer is "[s]ubject to an agreement to terms of contract of sale and further subject to a Bargain and Sale agreement[ ]with [TNC]." The letter also stated that if the defendants were interested in entering into a bargain sale agreement with the County, then the defendants should check the appropriate box at the bottom of the letter. On the copy of the letter admitted into evidence at trial, the boxes for "I accept the County's Offer" and "Interested in Bargain Sale" are checked off, with the contact information for the defendants' counsel handwritten below.
As of late August 2010, approximately one year after the August 2009 meeting at which Gotthelf, TNC, Minetree, and the County first discussed a potential sale of the subject property, TNC and the defendants had not entered into a contract of sale for the subject property. Around this time, Gotthelf expressed her frustration to Parsons that no contract of sale between TNC and the defendants had been executed, as Gotthelf had always desired to finalize the sale of the subject property before December 31, 2010. She expressed concern that TNC was attempting to change the legal structure of the deal, which, according to Gotthelf, would not allow her to take advantage of certain federal tax incentives associated with a bargain sale. Charles Cuddy, Gotthelf's attorney in connection with the sale of the subject property, further testified that because the subject property was owned by three different entities controlled by Gotthelf, the defendants "could never get to a point where we were satisfied that the tax consequences would work out."
Gotthelf also expressed frustration that TNC had asked Gotthelf to pay a fee of $10,000, which TNC later increased to $20,000, for TNC's expenses incurred during its negotiations in connection with the subject property. There were also concerns that TNC, a national organization that required approval for the sale of the subject property from its board of directors, would be unable to obtain that approval prior to December 31, 2010.
Nevertheless, Gotthelf continued to negotiate with TNC through at least September 8, 2010, offering a purchase money mortgage on the subject property so that TNC would not have to wait for funding approval before closing on the subject property. However, when these negotiations failed to result in a contract of sale, on September 10, 2010, Cuddy contacted TNC's attorney to inform TNC that Gotthelf was no longer interested in proceeding with a sale to TNC.
On September 21, 2010, the defendants entered into a contract of sale with PLT concerning the subject property (hereinafter the PLT/Catcove agreement). Gotthelf and John Halsey, PLT's president, had a preexisting personal and professional relationship. They had spoken about the subject property on numerous occasions prior to July 2009, which was the date the nonexclusive brokerage agreement was signed. During those discussions, Gotthelf and Halsey had considered, among other things, a sale of the subject property via a bargain sale. However, Gotthelf did not offer the subject property for sale to PLT because she knew that PLT would be unable to pay her initial asking price of $8 million. Ultimately, though, due to market forces, by September 2010, the value of the subject property had decreased significantly. Minetree was not a party to any of these discussions.
On January 26, 2011, the PLT/Catcove agreement was amended to reflect, among other things, that the sale of the subject property from the defendants to PLT was subject to the County's acquisition of the subject property from PLT, and that PLT would only be obligated to purchase the subject property from the defendants with a simultaneous closing of a sale of the subject property from PLT to the County. The amended PLT/Catcove agreement acknowledged that on December 21, 2010, the County Legislature approved the acquisition of the subject property by the [*6]County from PLT. Again, Minetree took no part in these negotiations, or in the approval process with the County Legislature.
Subsequently, on March 21, 2011, PLT and the County entered into an agreement (hereinafter the PLT/County agreement) whereby the County agreed to purchase the subject property from PLT after PLT acquired the subject property from the defendants. Yet again, Minetree was not part of the negotiations that resulted in this agreement. Appended to the PLT/County agreement were, among other things, three documents entitled "Disclosure Statement With Respect to a Proposed Transfer of an Interest in Real Property to [the County] Pursuant to Suffolk County Code § 342-6." Each form, which was signed by Gotthelf and notarized on October 6, 2010, lists "Lee Minetree" as a broker who "will earn a commission" as a result of a sale between the defendants and the County. Cuddy testified that Gotthelf was willing to pay the plaintiff a commission even after TNC was no longer part of the deal. However, Cuddy acknowledged that Gotthelf changed her mind after "a day or two." Cuddy also testified that it was an error by his office to include Minetree on the disclosure forms, as well as nearly identical disclosure forms dated September 14, 2010, and signed by Gotthelf. In describing the circumstances under which she signed the disclosure forms, Gotthelf testified that she maintained "some modicum of hope" that TNC might "actually pull itself together" to enter into a contract of sale with the defendants. She also expressed her hope that TNC might remain an option if the deal with PLT did not go through. Notably, paragraph 14 of the PLT/County agreement states that PLT and the County "agree that no broker brought about this sale."
In June 2011, the PLT/Catcove agreement was again amended to reflect, among other things, a reduced purchase price of $2,432,955, as certain parcels contained within the subject property would no longer be part of the sale.
The sale of the subject property closed on September 7, 2011. At the closing, the County remitted the purchase price directly to the defendants for PLT. PLT immediately conveyed six parcels, consisting of 13.9026 acres, to the County for the purchase price of $2,432,955.
In December 2011, the plaintiff commenced this action against the defendants, alleging, inter alia, that it was entitled to recover the sum of $97,318.20, representing a 4% commission on the sale of the subject property, since it was the procuring cause of the sale. Following motion practice, the Supreme Court awarded summary judgment to the defendants dismissing the complaint. On a prior appeal from the ensuing judgment in favor of the defendants and against the plaintiff, this Court modified the judgment by reinstating the first cause of action, alleging breach of contract, finding triable issues of fact, inter alia, as to whether the plaintiff was the procuring cause of the sale, and, alternatively, whether the defendants terminated the plaintiff's activities in bad faith and as a mere device to escape the payment of the commission (see Saunders Ventures, Inc. v Catcove Group, Inc., 151 AD3d 991).[FN1]
In November and December 2018, the Supreme Court conducted a nonjury trial. In a decision after trial dated March 18, 2019, the court concluded that the plaintiff had not satisfied its burden of demonstrating that it was the procuring cause of the sale. The court highlighted, among other things, that the evidence at trial confirmed that the County "was in the mix prior to the arrival of the Plaintiff." The court also found no evidence of bad faith arising from the defendants' replacement of TNC with PLT. Thereafter, a judgment was entered in favor of the defendants and against the plaintiff, in effect, dismissing the first cause of action. The plaintiff appeals.
"In reviewing a determination made after a nonjury trial, the power of this Court is [*7]as broad as that of the trial court, and this Court may render the judgment it finds warranted by the facts, bearing in mind that in a close case, the trial judge had the advantage of seeing the witnesses" (Cpex Real Estate, LLC v Tomtro Realty Corp., 202 AD3d 905, 906 [internal quotation marks omitted]; see Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499).
"It has long been recognized that a broker, save when [it] enjoys the benefit of a special agreement to the contrary, does not automatically and without more make out a case for commissions simply because [it] initially called the property to the attention of the ultimate purchaser" (Greene v Hellman, 51 NY2d 197, 205; see 2 Warren's Weed New York Real Property § 17.21). Notably, here, Minetree did not call the subject property to the attention of either the County or PLT, the parties contractually named in the sale of the subject property to the County.
Indeed, "there must be a direct and proximate link, as distinguished from one that is indirect and remote, between the bare introduction and the consummation" (Greene v Hellman, 51 NY2d at 206). "'Where the broker is not involved in the negotiations leading up to the completion of the deal, the broker must establish that [it] created an amicable atmosphere in which negotiations proceeded[[FN2]] or that [it] generated a chain of circumstances that proximately led to the sale'" (Saunders Ventures, Inc. v Catcove Group, Inc., 151 AD3d at 994, quoting Dagar Group v Hannaford Bros. Co., 295 AD2d 554, 555).
Sibbald v Bethlehem Iron Co. (83 NY3d 378), the seminal case in New York concerning a broker's right to recover a commission, states that: "The broker may devote his time and labor, and expend his money with ever so much of devotion to the interests of his employer, and yet if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions. He loses the labor and effort which was staked upon success. And in such event it matters not that after his failure, and the termination of his agency, what he has done proves of use and benefit to the principal. . . . He may have introduced to each other parties who otherwise would have never met; he may have created impressions which, under later and more favorable circumstances, naturally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no claim. It was part of his risk that failing himself, not successful in fulfilling his obligation, others might be left to some extent to avail themselves of the fruit of his labors" (id. at 383; see Greene v Hellman, 51 NY2d at 205-206).
Here, both sides presented evidence to support their contentions regarding which entity was the procuring cause of the sale of the subject property. The Supreme Court determined that the evidence "cuts both ways," and that the plaintiff failed to meet its burden of proof. It is undisputed that the plaintiff was integrally involved in the negotiations between the defendants and TNC, and Gotthelf even acknowledged that had the sale to TNC been consummated as contemplated, then the plaintiff would have been entitled to a commission.
However, as to PLT, the plaintiff failed to establish that it created an amicable [*8]atmosphere in which negotiations proceeded, or that it generated a chain of circumstances that proximately led to the transaction between the defendants, PLT, and the County (see Douglas Elliman, LLC v Silver, 136 AD3d 658; Jagarnauth v Massey Knakal Realty Servs., Inc., 104 AD3d 564; Omni Funding Corp. v Minskoff, 281 AD2d 288; Goldstein v Ballirano, 262 AD2d 529, 530; Hampton Realty of Bridgehampton v Conklin, 220 AD2d 385, 386; Edward Gottlieb, Inc. v City & Commercial Communications, 200 AD2d 395; Ackerman v Dobbs, 181 AD2d 704; cf. Gluck & Co. Realtors, LLC v Burger King Corp., 164 AD3d 562, 562; Friedland Realty v Piazza, 273 AD2d 351; Getreu v Plaxall Inc., 261 AD2d 574; Buck v Cimino, 243 AD2d 681, 684). Instead, the defendants and TNC were unable to resolve their contractual differences, and the proposed sale was not consummated. The majority places undue weight on the testimony of the County representative that a sale to the County was a "done deal" since Gotthelf had accepted the County's May 2010 offer to purchase the subject property via a bargain sale with TNC. Notably, as of September 10, 2010, when Cuddy contacted TNC's attorney to inform TNC that Gotthelf was no longer interested in proceeding with a sale to TNC, no contracts of sale had been signed, either by the defendants and TNC, or TNC and the County. Additionally, TNC and the defendants had never resolved certain material terms to the transaction, including whether the deal could close by December 31, 2010, and which parcels of the subject property would be included in the sale.
Further, it is undisputed that Gotthelf and Halsey, PLT's president, had a preexisting personal and professional relationship; that prior to July 2009, Gotthelf and Halsey had spoken about the possibility of selling the subject property via a bargain sale; and that Minetree was not part of the discussions that resulted in PLT replacing TNC in the deal structure. The majority emphasizes that Gotthelf and PLT did not, prior to Minetree's involvement in July 2009, approach the County concerning a bargain sale of the subject property. However, Gotthelf's undisputed testimony was that she knew that PLT was unable to pay her initial asking price of $8 million, but that due to market forces, by September 2010, the value of the subject property had decreased significantly, allowing PLT to enter into a contract of sale with the defendants.
Moreover, even though PLT and the defendants signed the PLT/Catcove agreement in September 2010 shortly after Gotthelf ceased negotiating with TNC, the sale of the subject property did not close until approximately one year later, at a reduced price and acreage. Thus, the terms of the actual sale of the subject property were materially different terms than those contemplated in the potential sale between the defendants, TNC, and the County (see Omni Funding Corp. v Minskoff, 281 AD2d 288; Cushman & Wakefield v 214 E. 49th St. Corp., 218 AD2d 464; Edward Gottlieb, Inc. v City & Commercial Communications, 200 AD2d 395).
The majority highlights that Gotthelf identified Minetree as a broker entitled to earn a commission on County disclosure forms, which Gotthelf signed after TNC was no longer "in the mix." However, the conflicting evidence highlighted herein includes Cuddy's testimony that the inclusion of Minetree's name on the forms was an error, and the testimony of Gotthelf and Cuddy that Gotthelf did not believe that Minetree was entitled to a commission. Their testimony outweighs the significance of Minetree's inclusion on the County disclosure forms (cf. Zere Real Estate Servs., Inc. v Parr Gen. Contr. Co., Inc., 102 AD3d 770, 773). In any event, the Supreme Court made credibility determinations concerning the testimony of Gotthelf and Cuddy, and there is no basis to disturb those determinations.
Thus, considering all of the evidence presented at trial, the plaintiff failed to establish a "direct and proximate link" between its effort and the ultimate sale of the property to PLT and the County (see Douglas Elliman, LLC v Silver, 136 AD3d 658; Hampton Realty of Bridgehampton v Conklin, 220 AD2d at 386).
Finally, the evidence failed to establish that the defendants terminated the plaintiff's activities in bad faith and as a mere last-minute device to escape the payment of the commission (cf. Gluck & Co. Realtors, LLC v Burger King Corp., 164 AD3d at 563; Friedland Realty v Piazza, 273 AD2d at 351-352). From the onset of the defendants' relationship with TNC, TNC was aware that it was critical to the defendants that the sale close on or before December 31, 2010, because of the perceived significant tax consequences.
Ultimately, both the County and PLT were parties that were known to Gotthelf and the defendants prior to Minetree's involvement in the sale of the subject property. Prior to Minetree's involvement, the County directly expressed to Gotthelf its interest in purchasing some of Gotthelf's property, and Gotthelf had discussed the sale of the subject property with Halsey of PLT. Since the plaintiff failed to establish that it was the procuring cause of the sale between the defendants, PLT, and the County, the judgment should be affirmed.
ENTER:
Maria T. Fasulo
Clerk of the Court

Footnotes

Footnote 1: 1 This Court's prior decision and order (see Saunders Ventures, Inc. v Catcove Group, Inc., 151 AD3d 991) recited facts pertinent to the plaintiff's appeal from the Supreme Court's summary judgment order. However, the factual recitation contained in this Court's prior decision and order does not constitute the law of the case (see Peri Formwork Sys., Inc. v Lumbermens Mut. Cas. Co., 112 AD3d 171, 177-178; Brownrigg v New York City Hous. Auth., 29 AD3d 721, 722-723).

Footnote 2: 2 Recently, in SPRE Realty, Ltd. v Dienst (119 AD3d 93), the Appellate Division, First Department, questioned the "amicable atmosphere" or "amicable frame of mind" language, noting that the Court of Appeals has never sanctioned such a standard (id. at 99 [internal quotation marks omitted] ["We regard the 'amicable atmosphere' and 'amicable frame of mind' standards as somewhat broader and more amorphous than the requirement of a 'direct and proximate link,' or even a requirement that the broker 'generated a chain of circumstances which proximately led' to a transaction's consummation. Although courts have attempted to harmonize the continued use of the 'amicable' phrases discussed above with Court of Appeals precedent articulating the 'direct and proximate link standard, the former phrases are not precise enough terms by which to determine whether a broker is the procuring cause of a transaction. Reliance on the creation of an 'amicable atmosphere in which negotiations went forward' seems to ignore the proximity element of the 'direct and proximate link' test" (footnote omitted)]).